RENE VON SCHLEINITZ, Appellant, v. NORTH HOTEL COMPANY ET AL.—23 S. W. (2d) 64.

Division One, October 14, 1929.

*Meredith & Harwood* for appellant.

*Walsh & Aylward* for respondent W. J. Skeer; *E. M. Metcalf* for respondent J. E. Secrest; *John A. McGuire* for respondent Fred W. Colegrove; *Gossett, Ellis, Dietrich & Tyler* for respondent Ben Hurst; *Mertseimer & O'Donnell* for respondent E. H. Lowry.

SEDDON, C.—This is a suit in equity, commenced in the Circuit Court of Jackson County, at Independence, on March 2, 1925, wherein plaintiff (appellant herein), as the owner of a four-story and basement hotel building, and the land upon which said building is erected, described as lots 19 and 20 in Union Station Addition in Kansas City, Missouri, seeks a judgment in the sum of $37,137 for accrued and unaccrued rents, together with the cost of making certain repairs to said building, under the terms of a written lease, dated July 5, 1919, by and between J. North Mehornay, a former owner of said real estate, as lessor, and Frank Josephson and Samuel N. Josephson, as lessees, and under certain written modifications of, and supplements to, said lease, subsequently made, and wherein plaintiff further asks to have the judgment sought for such accrued and unaccrued rents, and for such repairs, to be declared and adjudged to be a first, prior and superior lien upon and against all of the furniture, fittings, fixtures and equipment contained in said hotel building and located upon said premises, together with a foreclosure of such equitable lien by sale of said personal property, furniture, fittings and equipment.

The defendants in said suit are the North Hotel Company, a corporation, and Ben Hurst, W. J. Skeer, E. H. Lowry, Fred W. Colegrove and J. E. Secrest, individuals. The corporate defendant, North Hotel Company, failed to appear in said action and defaulted. The individual defendants aforesaid filed separate answers, seeking certain affirmative relief, and claiming an interest, right and title in and to said personal property, and in and to a certain deposit or fund of $17,500 paid to the original lessor, Mehornay, by the original lessees, Josephson, under the terms of said written lease agreements, and which deposit or fund is now held by the plaintiff, the interest, right and title claimed by said individual defendants arising out of a certain chattel mortgage, dated April 7, 1922, executed by defendant, North Hotel Company, as mortgagor, in favor of defendant, Ben Hurst, as mortgagee, to secure the payment of nineteen certain promissory notes made by the defendant, E. H. Lowry, payable to the order of said defendant, Ben Hurst, aggregating the principal sum of $9,500; and the individual defendants, by their separate answers herein, pray that such chattel mort-

gage be declared and adjudged to be a first, prior, paramount and superior lien upon said personal property, furniture, fittings and equipment, and against said deposit or fund of $17,500, held by, and in possession of, plaintiff at the time of the commencement of plaintiff's equitable action.

A trial of the action resulted in a decree favorable to the claims of the individual defendants, as presented by their separate answers herein, and plaintiff was allowed an appeal to this court from the decree so entered. We retain jurisdiction of the appeal because the pecuniary amount in controversy between the respective parties exceeds $7,500, exclusive of costs.

The evidence herein is mostly documentary. From such documentary evidence, we glean the following facts:

J. North Mehornay was the owner, in the year 1919, of a vacant and unimproved tract of land in Kansas City, described as lots 19 and 20 in Union Station Addition, and known as No. 2027-29 Main Street. On July 5, 1919, said J. North Mehornay, as lessor, entered into a written lease of said described premises with Frank Josephson and Samuel N. Josephson, as lessees, wherein said premises were leased to the said lessees and their assigns for a term of twelve and one-half years, beginning on February 1, 1920, and ending on July 31, 1932, at and for an agreed rental of $1460 per month, payable by the lessees to the lessor on the first day of each and every month during said term of twelve and one-half years. The lease agreement obligated the lessor, Mehornay, to erect on said vacant land a three-story and basement, brick and stone hotel building, having at least seventy-four guest rooms. Under the terms of said written lease, the lessees, Josephson, covenanted and agreed with the lessor, J. North Mehornay, "to punctually pay the rental; to take good care of said premises, and keep the interior of same in good repair, usual wear and providential destruction excepted, . . . and to repair all injury or damage done or occasioned to said premises by their neglect; and at the expiration of the term hereby created, whether terminated by lapse of time or otherwise, to surrender to lessor quiet and peaceable possession of said premises hereby let, with all appurtenances and fixtures, in as good condition as same were taken possession of, usual wear and tear and damage or destruction by fire, proceedings at law, or by any providential means excepted: . . . and should the lessees fail to make, or cause to be made, any repairs to the demised premises, or to said property, which the lessees ought to make, and fail to make, the lessor, without waiving any right to declare a forfeiture of this lease, may pay the cost thereof, and add the amount or amounts so paid, together with interest thereon at the rate of eight per cent per annum from date of payment, to the installment of rent next thereafter falling due un-

der this lease, and lessees consent and agree to pay the same to the lessor on the day said next installment thereafter becomes due and payable.'' The lease further provides that, upon breach of any of the foregoing covenants and agreements, ''the lessor shall have the right to reenter upon the premises hereby let and take possession thereof, . . . and it shall and may be lawful for the lessor, his agents, attorneys, successors or assigns, at his or their election, to declare said term ended, and to enter into the premises, or any part, either with or without process of law, . . . but for this cause, the obligation to pay rent for the full period of this lease shall not cease.'' The lease further provides that ''the lessees shall own and keep in and upon said premises during the whole of said term, free of all liens and encumbrance, furniture, fittings and fixtures suitable for running said hotel, and all of said property of said lessees on said leased premises, or which may at any time during the life of this lease be placed in said premises, or any portion thereof, whether subject to legal exemption or not, and the sum of fifteen thousand dollars paid as advance rent, as per the terms of a separate contract between the parties hereto of even date herewith, shall be bound by and subject to the payment of the rent herein provided for, and the performance of the other terms and conditions of this lease, and the lessees shall keep said property insured for its reasonable value, and (keep) said insurance assigned to the lessor of said premises as his interest may appear.'' The lease also contains the further provision that the lessees contemplate organizing and incorporating a corporation, under the laws of Missouri, to occupy and operate the leased premises, and, in that event, it is agreed that the lessees may assign all their right, title or interest in and to the said lease to such corporation, with the further agreement that ''the said corporation shall assume all of the duties and obligations of the lessees herein, and thereupon the personal liability of the lessees, as parties to this lease, shall terminate, and lessees herein shall be relieved of all liability hereunder, and lessor shall only hold said corporation and its furniture and fixtures, as herein stated, for the fulfillment of the terms of this lease; provided lessees shall duly assign and transfer to said corporation all of the furniture, fittings and fixtures to be installed by lessees in and on the premises aforesaid, for conducting and operating a hotel, as aforesaid.'' It was further provided in said lease that all covenants and conditions of the lease shall run with the premises, and to the heirs, assigns and successors of the parties thereto, respectively.

Concurrently with the execution of said lease, the parties thereto entered into a collateral written agreement, dated July 5, 1919, whereby the deposit or fund of $15,000 (mentioned in said lease) was created, such agreement requiring that ''the lessees shall pay, in

advance, rental therein provided for in the sum of $15,000 to be applied upon the last $15,000 of rental to accrue under said lease, which lease is hereto attached and made a part hereof, as if fully written herein." The said collateral agreement further provides that, from the date of payment of said sum of $15,000 by the lessees to the lessor, and until the actual accrual and maturity of said rental, the lessor shall pay to the lessees interest on said sum of $15,000 at the rate of six per cent per annum, payable semi-annually, and that the amount upon which interest shall be so paid by lessor shall be reduced monthly as the various monthly installments of rent making up said sum of $15,000 shall mature. The collateral agreement contains the further provision that, "should the lease aforesaid in any way terminate, or be terminated, without fault on the part of the lessees in said lease named, or of the corporation, provision for an assignment of lessees' interest to which (corporation) is in said lease made, the said sum of $15,000, or so much as may be due lessees, shall be repaid to said lessees, or to said corporation, within ten days from date of said termination, and for the repayment of said $15,000, mentioned herein, and the application of the same, as herein provided, the said lessees, or said corporation, shall have a lien on said real estate described herein, and in said lease, until such time as said sum shall be paid second parties (lessees), or said corporation to be organized, in cash, or until same shall be cancelled by application upon payment of rent, as hereinbefore mentioned; it being agreed that if said sum of $15,000 shall not be returned to lessees, then lessees are hereby authorized at their option to continue in possession of said leased premises, under the terms of this lease, until the rentals mentioned herein satisfy and liquidate the same, and accrued interest; and if said lessees do not exercise said option mentioned herein, the said lessees, or the corporation to whom they may assign said lease, can foreclose the lien hereby given to them, as if same were a mortgage on said leased premises, the real estate described herein."

On September 18, 1919, J. North Mehornay, as lessor, and Frank Josephson and Samuel N. Josephson, as lessees, entered into a so-called "Supplement to the Original Lease" (dated July 5, 1919), wherein the lessor, Mehornay, agreed to erect a four-story and basement, brick and stone hotel building, instead of the three-story and basement hotel building as provided in the original lease of July 5, 1919, in consideration of which the said lessees agreed to pay to lessor, J. North Mehornay, as rental for said premises the sum of $1800 per month instead of $1460 per month, as in said original lease agreement provided, and to pay said sum in advance on the first day of each month throughout the life and term of said lease (twelve and one-half years), and that the advance rental to be paid as provided

in the original lease of July 5, 1919, shall be $17,500, instead of $15,000 as therein provided. The supplement to the original lease contained the express provision that "this instrument is supplemental to the lease aforesaid and that, except as herein expressly modified or changed, all terms and provisions of the lease aforesaid shall continue in full force and effect."

Concurrently with the execution of the aforesaid supplement to the original lease, the parties thereto entered into a collateral contract or agreement, dated September 18, 1919, which provided for an advance in the rental deposit, to be made by the lessees to the lessor, from $15,000 to $17,500. Such collateral contract contains the following clause: "Subject to the changes or modification herein made, the aforesaid agreement of July 5, 1919, shall continue in full force and effect."

On February 2, 1921, the lessor, J. North Mehornay, and the lessees, Frank Josephson and Samuel N. Josephson, entered into a so-called written "Consent to Mortgage," wherein "said J. North Mehornay does consent that the said lessees, and any lawful assigns of the lessees, may create or receive a lien or liens, either by way of chattel mortgage, or in the nature of chattel mortgage, upon said hotel furniture and equipment, subject, however, to all rights and liens of the lessor in said lease instrument and supplemental agreements and contracts relating thereto, as well as to assigning or receiving assignment and making reservations of the money deposits aforesaid, as to any interest or rights the lessees may have therein. No such chattel mortgage lien or other lien so given, created or received upon such hotel equipment, and no assignment of lessees' rights in or concerning the same, or said money deposits, shall be otherwise than expressly subject to the lien and liens and all rights, title and interest of the said lessor, his heirs and assigns, and his grantees, in, to, upon and concerning said hotel equipment and money deposits. And it is expressly understood and agreed that the said lessor, J. North Mehornay, his heirs and assigns and his grantees, shall be under no obligation or duty, until such time as he sees fit, to foreclose any lien given lessor under said lease, and may permit defaults and claims under said lease to stand, accrue and multiply at will, and have full protection against all of the same as in said lease provided until such time as lessor elects to foreclose the lien or liens given him under said lease, and even upon foreclosure thereof said lessor shall have all rights and protection given and afforded him under said lease as though this instrument had not been executed."

All of the foregoing lease agreements, collateral contracts, and supplements thereto, were duly acknowledged by the respective parties, and were promptly filed for record and recorded in the office

of the Recorder of Deeds in and for Jackson County, Missouri, at Kansas City.

Presumably, although such is not shown in the record now before us, a corporation with the name of "North Hotel Company" was organized and incorporated under the laws of Missouri, as is contemplated by the aforesaid original lease agreement between J. North Mehornay, as lessor, and Frank Josephson and Samuel N. Josephson, as lessees, and the said lessees, Josephson, seemingly assigned all of their rights and interests in and to such lease agreements, and in and to the various collateral contracts and supplemental agreements aforestated, to the said corporation, North Hotel Company, which corporation seemingly stepped into the place and stead of the original lessees, Josephson.

Thereafter, and on April 7, 1922, the North Hotel Company made and executed a chattel mortgage, securing the payment of nineteen promissory notes of $500 each, aggregating $9,500, made by E. H. Lowry, who was then president of the North Hotel Company, in favor of Ben Hurst, the first of said notes falling due on June 15, 1924, and the remaining eighteen notes falling due consecutively, one each on the fifteenth day of each month thereafter until all of said notes have been paid, by the terms of which chattel mortgage the said North Hotel Company, as mortgagor did mortgage, assign, transfer, convey and set over to said Ben Hurst, as mortgagee, all of the furniture, furnishings, fittings and other equipment contained in the leased premises, or that may thereafter be brought therein, and wherein and whereby the said North Hotel Company did also "assign, transfer and set over to said Ben Hurst, as mortgagee, the certain lease and leasehold thereby created from J. North Mehornay to Frank Josephson and Samuel N. Josephson, dated July 5, 1919, and recorded in Book B-1989 at page 61, in the office of the Recorder of Deeds at Kansas City, Missouri, and upon and covering lots 19 and 20 in Union Station Addition in Kansas City, Missouri, said lease being duly assigned by the said Frank Josephson and Samuel N. Josephson to the North Hotel Company on the 19th day of January, 1921, and filed for record in the office of said Recorder of Deeds of Jackson County, Missouri, at Kansas City, on the 20th day of January, 1921, together with all the right, title and interest of the said North Hotel Company in the said deposit of $17,500 made in connection with said lease by the said Josephsons with the said Mehornay, and held by the said Mehornay,' in accordance with said lease and said agreements relating to such deposit, the same having been made to secure performance of said lease, or in connection therewith." The chattel mortgage further recites that "this mortgage (is) being given subject to the lien created in said lease from Mehornay to Josephsons, and subject to the cer-

tain mortgage made and executed by the said North Hotel Company to Sam Josephson, dated April —, 1921, . . . given to secure the payment of certain notes aggregating the total sum of $25,000, upon which total sum there is now due the sum of $19,500, and covering and including all of the personal property and leasehold herein included and covered, and hereinbefore described. Upon the payment of the said indebtedness of $19,500, then this mortgage shall become the first lien and the first mortgage against the personal property and the leasehold hereinbefore described. In the event that default be made in the payment of all or any part of said indebtedness, the said Ben Hurst shall have the right and privilege of paying said indebtedness (and) thereupon shall be entitled to exercise all rights and methods given in said mortgage for the enforcement of the payment of the indebtedness secured thereby. This mortgage is given in pursuance of resolution passed at a meeting of all the stockholders and at a meeting of all of the directors of said company, at a time while it was free from debt other than its obligations for payment of rent under the performance of the aforesaid lease, in respect to which it was in no manner in default, and from the obligation incurred by said chattel mortgage heretofore given to the said Sam Josephson, and which resolution provides that this mortgage shall be binding and effective as against the stockholder(s) of said company, whether now owning or hereafter acquiring stock, and is intended, if legally it may be binding and effective, as to all future purchasers of said corporation.'' In and by the terms and provisions of such chattel mortgage, the mortgagor, North Hotel Company, covenanted to and with the mortgagee, Ben Hurst, and his representatives and assigns, that ''until all of said notes are fully paid, it will pay all rents reserved under said lease, and fully keep, perform and observe all of the terms and conditions thereof; that it will continue to operate, as a running and going business, the hotel business now being carried on in said hotel premises; that it will keep all of said furniture and equipment in good condition and order, and will repair any and all injuries thereto, and replace any and all that may be worn out with like articles of as equally good character and quality, to be new and not second-hand; . . . (and) that it will not move or attempt to move any of said mortgaged property out of said premises without the written consent of the mortgagee, nor will it attempt to sell or dispose of the same, or any of the same, without written consent of the mortgagee herein.'' The chattel mortgage further provides that, in case of default in payment of any part of the principal or interest of any of said notes, when due, or in case any of the covenants of said chattel mortgage are not promptly performed and observed, then the chattel mortgage may be foreclosed, and the mortgagee, Ben Hurst, or the holder or

holders of a majority of the unpaid notes secured thereby, may proceed to sell "all said mortgaged property, including said lease and leasehold" at public vendue to the highest bidder, and "any purchaser or purchasers at such sale shall have and obtain absolute and good title to the thing or things so sold and purchased, respectively." The chattel mortgage also provides that foreclorure might be made and had by and through an appropriate suit in court. The said chattel mortgage was duly acknowledged by the mortgagor, North Hotel Company, and was filed for record and recorded in the office of the Recorder of Deeds for Jackson County, at Kansas City, on April 11, 1922.

The plaintiff-appellant, Rene Von Schleinitz, purchased and acquired the fee-simple title to the said real estate and leased premises by warranty deed, dated April 15, 1923, executed and duly acknowledged by J. North Mehornay and wife, conveying to plaintiff all of lots 19 and 20, Union Station Addition, in Kansas City, which warranty deed was filed for record and duly recorded in the office of the Recorder of Deeds for Jackson County, at Kansas City, on May 2, 1923. Concurrently with the execution and the delivery of said warranty deed to plaintiff, the original owner and lessor of the leased premises, J. North Mehornay, assigned to the plaintiff-appellant all rights and interest in and to the original lease agreement, supplemental agreements, collateral contract, and consent to mortgage, theretofore entered into by and between said J. North Mehornay and Frank Josephson, and Samuel N. Josephson, and hereinabove mentioned and described, and at the same time Mehornay turned over and delivered to plaintiff the cash deposit of $17,500 paid to Mehornay by the original lessees, Josephson, under the terms of the original lease agreement and the several agreements supplemental and collateral thereto.

On or about February, 1924, the defendant Ben Hurst, for a valuable consideration sold and assigned to the defendant, W. J. Skeer, the chattel mortgage aforesaid, dated April 7, 1922, made by the North Hotel Company, as mortgagor, to Ben Hurst, as mortgagee, together with the nineteen promissory notes, aggregating $9,500, described in and secured by said chattel mortgage. At the time of the sale and assignment of such chattel mortgage and promissory notes by Ben Hurst to W. J. Skeer, none of said nineteen promissory notes was then due and payable. The defendant, E. H. Lowry, as the original maker of the nineteen promissory notes secured by said chattel mortgage, is personally liable for the payment of such notes, and therefore said Lowry is desirous that the payment of such notes be made through a foreclosure of the said chattel mortgage and a sale of the mortgaged property thereunder, with the application of the proceeds of such foreclosure sale (upon said notes)

in extinguishment of his personal liability as the original maker of said promissory notes, which affirmative relief defendant Lowry prays in his separate answer filed herein. By the terms of a written agreement dated August 8, 1922, the defendants F. W. Colegrove and J. E. Secrest purchased from the defendant, E. H. Lowry, all of the capital stock of the North Hotel Company, and, as part of the consideration of the sale of the capital stock of said corporation, the said Colegrove and Secrest assumed and agreed to pay the nineteen promissory notes described in and secured by the said chattel mortgage from the North Hotel Company to Ben Hurst, dated April 7, 1922. Wherefore, the defendants Colegrove and Secrest are insisting upon being relieved of their personal liability for the payment of said notes, and are demanding (by way of affirmative relief prayed in their separate answer filed herein) that the said chattel mortgage be foreclosed, and that the mortgaged property be sold under the terms of the said chattel mortgage, and that the proceeds of such sale be applied in satisfaction and payment of the promissory notes secured by said chattel mortgage. Likewise, the defendant Ben Hurst, by his separate answer filed herein, asks to be relieved of his personal liability as the endorser of the promissory notes secured by said chattel mortgage, and that the defendant W. J. Skeer, as the owner of said promissory notes, be required and allowed to enforce and procure the payment and satisfaction of said notes by a sale, under foreclosure of the aforesaid chattel mortgage, of the personal property described therein, and by the application of the proceeds of such foreclosure sale upon, and in satisfaction of, the promissory notes secured by said chattel mortgage. The defendant W. J. Skeer, by his separate answer herein, prays that the chattel mortgage made by North Hotel Company, as mortgagor, to Ben Hurst, as mortgagee, dated April 7, 1922, he declarad to be a first, prior and superior lien on all of the furniture, fittings and equipment contained in the leased premises, and that plaintiff be required to apply the deposit of $17,500 (now in plaintiff's possession), or as much thereof as may be necessary, to the satisfaction and payment of the several unpaid notes secured by said chattel mortgage, which unpaid notes (amounting to $6,000, and interest thereon) are now owned and held by said W. J. Skeer, or, if a sale be ordered of said furniture, fittings and equipment, that the proceeds of such sale be applied, first, to the payment of the costs of such sale, and, unless said unpaid notes owned and held by said W. J. Skeer be satisfied and paid out of the aforesaid deposit of $17,500, then that said unpaid notes be satisfied out of the balance of the proceeds of such sale.

The evidence herein further shows that in May, 1924, one E. F. Frerking, who seemingly had acquired the majority of the capital stock of the North Hotel Company and who was then the purported

president of said corporation, went from Kansas City to Milwaukee, Wisconsin, where plaintiff resides, and had an interview with plaintiff, in which Frerking sought a reduction in amount of the monthly rents to be paid for the leased premises. Frerking pleaded with plaintiff that the first of the series of nineteen notes for $500 each, secured by the chattel mortgage of April 7, 1922, would fall due on June 15, 1924, and that the remaining eighteen notes, each for $500, would fall due consecutively, one each on the fifteenth day of each month thereafter, and that it would be financially impossible for the North Hotel Company to continue to pay the $1800 per month rental, as required by the terms of the existing lease agreements, and also to pay the sum of $500 per month required to satisfy and pay the nineteen promissory notes secured by the chattel mortgage of April 7, 1922, as those several notes would become due and payable. Negotiations respecting the matter of a reduction in the monthly rental to be paid by the North Hotel Company for the leased premises were had between Frerking and plaintiff, and their respective attorneys, which finally resulted in the making of a written agreement, dated June 2, 1924, by and between the plaintiff, Rene Von Schleinitz, as party of the first part, and the said North Hotel Company, as party of the second part. Such written agreement was duly acknowledged by the respective parties, and was duly filed for record and recorded in the office of the Recorder of Deeds at Kansas City on August 18, 1924. The said agreement recites that the party of the first part, Rene Von Schleinitz, is the assignee and transferee of all the right, title, interest and estate of J. North Mehornay, and the party of the second part, North Hotel Company, is the assignee and transferee of all the right, title, interest and estate of Frank Josephson and Samuel N. Josephson, in and to the original lease dated July 5, 1919, the collateral agreement dated July 5, 1919, the supplement to the original lease, dated September 18, 1919, the collateral agreement dated September 18, 1919, and the Consent to Mortgage, dated February 2, 1921, each and all of which instruments were made by and between J. North Mehornay, as the original lessor, and Frank Josephson and Samuel N. Josephson, as the original lessees, and that "the parties hereto have agreed to certain changes and modifications in some of the terms and conditions of the contracts and agreements hereinabove referred to." The agreement then provides that, "for and in consideration of the mutual covenants and agreements hereinafter set forth, and in further consideration of the sum of one dollar in hand paid each to the other, . . . the party of the second part (North Hotel Company) hereby agrees to pay, and the party of the first part (Rene Von Schleinitz) hereby agrees to accept, the following rent per month for said building instead of the present rent of $1800 a month, viz.: For the year be-

ginning June 1, 1924, the sum of $1400 per month; for the year beginning June 1, 1925, the sum of $1500 per month; for the year beginning June 1, 1926, the sum of $1600 per month; for the year beginning June 1, 1927, the sum of $1750 per month; and for each of the years thereafter, viz.: beginning June 1, 1928, and until the expiration of said lease, the sum of $1800 per month; and to pay said stipulated and agreed rent in monthly installments in advance on the first day of each calendar month.'' The said agreement then provides that ''in consideration of the reduction of rent hereinabove provided for, the party of the second part (North Hotel Company) hereby waives any and all claims of every kind and character in and to the $15,000 advanced payment of rental provided for and paid under the terms of the said agreement dated July 5, 1919, and in and to the increase thereof to $17,500 provided for in the supplement to lease dated September 18, 1919, and hereinabove referred to. Neither the party of the first part (Rene Von Schleinitz), nor his heirs, executors, successors, or assigns, shall hereafter be liable or accountable in any manner for any part of said $17,500, or for any interest thereon, nor shall any part of the same be considered as an advance of rent, nor shall the second party (North Hotel Company) be entitled to any credit upon the rental herein agreed to be paid by reason of said $17,500, but all rentals herein provided for shall be due and payable as herein stipulated. All references to said $15,000 or $17,500, and all covenants, agreements and obligations between the parties hereto, or their predecessors in interest, involving said sums and every part thereof, including interest, wherever contained in any of the instruments hereinabove referred to, are hereby cancelled and henceforth considered as of no force or effect. The party of the second part (North Hotel Company) hereby expressly releases and discharges the lien on the real estate hereinabove described (Lots 19 and 20, Union Station Addition), created by the said agreement dated the 5th day of July, 1919, and given to secure the repayment of said sum of $15,000 and the increase of said sum to $17,500, as provided by the contract dated the 18th day of September, 1919.'' The said agreement contains the further provisions, as follows: ''The party of the second part (North Hotel Company) hereby declares and warrants that all the furniture, fittings, fixtures and equipment, and all other personal property owned by the party of the second part now located in said building is free and clear of all liens, claims and encumbrances of every kind and character, save and except only a chattel mortgage dated April 7, 1922, and recorded in said Recorder of Deeds office on April 11, 1922, in Book B-2266 at page 332, to Ben Hurst, securing the sum of $9,500, and interest, payable in monthly installments of $500 each, beginning June 15, 1924, and the party of the second part (North Hotel Company) further agrees

that upon the payment of each of said $500 notes, the same shall be cancelled and delivered to the party of the first part. The party of the second part (North Hotel Company) does hereby sell, assign and transfer to the party of the first part all said furniture, fittings and equipment now in said building, or that may be placed therein, to secure the rent herein provided for and the other terms and conditions of this lease, and binds itself not to sell, or attempt to sell, or remove, said personal property out of the building, except in accordance with the terms and conditions of said lease. In the event of the failure of the party of the second part to comply with the terms and conditions of this lease, or any part thereof, the lessor may take possession of said property, including said furniture, fittings, fixtures, and equipment, and sell said personal property in the manner provided by the laws of the State of Missouri governing the sale of personal property under a chattel mortgage, and out of the proceeds arising from said sale pay any indebtedness of the lessee under the terms of this lease, together with the costs and expenses of said sale, and under such sale the lessor may become the purchaser of said property. The party of the second part hereby agrees and binds itself not to pledge said personal property, or otherwise encumber the same, during the term of this lease. . . . It is further agreed by and between the parties hereto that the majority of the capital stock of the said North Hotel Company shall not hereafter be sold, transferred or pledged without the consent in writing of the party of the first part (Rene Von Schleinitz), which consent the party of the first part binds himself to give, provided the purchaser thereof is a party financially responsible and reasonably able to carry out all the terms, conditions and agreements of the lease, contracts and agreements, including this agreement, and is also of good moral character. The party of the second part (North Hotel Company) further binds itself to endorse upon the certificates of stock of said North Hotel Company an appropriate reference to the terms and conditions under which a sale of said stock may be had in accordance with the terms hereof, and to exhibit said endorsement to the party of the first part, or his duly authorized agent. All the terms and provisions of all the instruments hereinabove referred to not herein expressly changed, modified or cancelled shall be held and considered to continue in full force and effect.''

The evidence on behalf of the defendants (respondents here) tends to show that none of the defendants (and particularly the defendant W. J. Skeer, who was then the assignee and holder of the chattel mortgage from North Hotel Company to Ben Hurst, dated April 7, 1922, and of the nineteen promissory notes of E. H. Lowry secured thereby) was consulted or notified of and concerning the negotiations between Frerking and the plaintiff, Von Schleinitz, leading up to

the making of the aforesaid written agreement between plaintiff, as lessor, and the North Hotel Company, as lessee, dated June 2, 1924; and the uncontroverted evidence on behalf of defendants tends to show that none of the defendants, including W. J. Skeer, had any information or knowledge respecting the making of such written agreement until after such agreement had been executed by the parties thereto, and had been filed for record in the office of the Recorder of Deeds for Jackson County, at Kansas City.

After the execution of the aforesaid agreement of June 2, 1924, the lessee, North Hotel Company, paid to plaintiff the reduced rental of $1400 a month until February, 1925, on the first day of which month the said lessee, North Hotel Company, defaulted in the payment of the rent for the leased premises. Seemingly, the North Hotel Company also paid seven of the nineteen $500 notes owned and held by W. J. Skeer, and secured by the chattel mortgage of April 7, 1922, as those seven notes severally fell due during the months of June to December, inclusive, 1924. Default was made in the payment of the chattel mortgage note for $500 (held by W. J. Skeer) falling due on January 15, 1925. Meanwhile, in November, 1924, E. F. Frerking had sold and assigned his controlling interest in the capital stock of the North Hotel Company to certain individuals named Wear and Rasmus, who thereafter appear to have owned the majority of the capital stock of the North Hotel Company. Sometime in February, 1925, W. J. Skeer sent a telegram to plaintiff at Milwaukee, Wisconsin, advising plaintiff of the precarious condition in the affairs of the North Hotel Company, and (according to the testimony of plaintiff) that the leased premises were being abandoned by the lessee, North Hotel Company. Upon receiving such telegram from Skeer, the plaintiff came to Kansas City and found one Long to be in charge, or custody, of the leased premises as the purported agent or employee of the North Hotel Company. Respecting what took place immediately before and after the arrival of plaintiff in Kansas City, in February or March, 1925, we deem it best to quote the testimony as shown in the record herein. Plaintiff testified as follows:

"Q. I will ask you what was the first notice you had of the fact that there was any critical condition in the affairs of the North Hotel Company, at about what date? A. A wire from, I believe, Mr. Skeer. . . . Q. Well, without going too much in detail, was it a fact Mr. Skeer wired you the North Hotel was being abandoned? A. Yes.

"Q. And has anybody paid you since the $1400 was paid for the January, 1925, rent? A. No, sir.

"Q. Do you remember that there was a man in charge of the hotel when you got here by the name of—what was his name? A. I think it was Long. Q. State whether or not you saw Mr. Rasmus.

A. I never saw Mr. Rasmus. Q. What had become of Mr. Frerking, who had formerly been a stockholder of the North Hotel Company? A. To the best of my knowledge he sold his stock to Mr. Rasmus and Mr. Wear. Q. In order not to go into too much detail at this stage of the proceedings, I will ask you if Mr. Long, who was in charge of the hotel, did actually walk out and deliver possession of the hotel to you? A. He did. Q. Did he decline to stay there and run it? A. Yes. Q. Was there anybody else representing the North Hotel Company you could find who would take the hotel? A. No, sir. . . . Q. Mr. Long, who was the last survivor, had departed? A. Yes. Q. And you were in possession of the hotel property? (No answer made by witness to the preceding question.)''

Cross-examination: ''Q. Mr. Von Schleinitz, when you came to Kansas City, along in March, you found the North Hotel in possession of a representative of the North Hotel Company, didn't you, a man by the name of Long? A. When I got here, it was; yes. Q. And you demanded possession of the hotel, unless the rent was paid, didn't you? A. Well, I don't think he even gave me a chance to demand that. He simply said, 'I am leaving.' Q. Didn't you and Mr. Harwood ask me if we would turn over possession of the hotel to you, and I told you this man Long would step out and you could take possession of the hotel property? A. Yes, sir. Q. And you did then go down with Mr. Long and took possession; he turned possession over to you? A. Yes, sir.''

Re-direct examination: ''Q. In connection with possession being demanded of Mr. Long, isn't it a fact that Mr. Long would only wait until you got down here to take possession, and that he threatened to walk out every day unless you got here? A. He threatened to leave the property without anyone in charge, and I believe, upon request, he stayed a few days longer.''

Mr. Landry Harwood, who had acted as the attorney for plaintiff at the time of the negotiations between plaintiff and Frerking, resulting in the execution of the written agreement between plaintiff and the North Hotel Company, dated June 2, 1924, and who is the counsel for plaintiff in the present action, testified as follows:

''After Mr. Von Schleinitz got down here in March of 1925, I made a trip to the North Hotel, and there found a man by the name of Long, who said he represented the North Hotel Company as manager, as I understood; and Mr. Long said that he was going to leave the premises, that they were not any longer going to operate it, that the rent could not be paid, and he was induced to remain at our solicitation until Mr. Von Schleinitz could get here. I have no recollection of making any formal demand on Mr. Long for possession, but on the contrary was urging him to stay until Mr. Von Schleinitz could get here rather than lock the hotel doors and leaving it to my

client to determine what he would do then. After he (Von Schleinitz) got here, and Mr. Long was withdrawing, he (Long) signed a short statement in which he simply said, as agent for the North Hotel Company, he turned over possession to Mr. Von Schleinitz.''

By a written instrument, dated March 3, 1925 (the day following the commencement of the instant action), and addressed to, and personally served upon, W. J. Skeer and Ben Hurst, the plaintiff made a tender of possession of the premises to the defendants Skeer and Hurst. The written tender of possession reads as follows:

''The North Hotel Company, the lessee and occupant of the property known as North Hotel, 2027-29 Main Street, Kansas City, Missouri, having indicated its determination to quit and surrender possession of said property, the undersigned, the owner thereof,. last week tendered to you, and each of you, the possession of said property, then stating that, if you desired possession under the terms of the present lease, immediate occupancy by you, or either of you, could be obtained. Thereupon you, and each of you, declined to accept the tender of possession. The North Hotel Company has now surrendered possession of the premises, and the undersigned is in actual possession thereof. I hereby again tender possession of the premises and if you, or either of you, desire to comply with the terms of the present lease, kindly give me prompt notice in writing addressed to me, care of my attorneys, Meredith and Harwood, 510 Rialto Building, Kansas City, Missouri. This notice is given you by reason of the fact that I am advised that you are interested in the chattel mortgage which purports to be a lien on the furniture in said premises, securing certain notes, the unpaid balance of which I am informed is $6000, and for the further reason that I am advised that the certificates of stock of the North Hotel Company are in your hands as collateral security for the payment of said notes. Nothing herein contained shall be construed as an admission, either expressed or implied, that you, or either of you, or anyone else, has any right, claim, or interest, whether by chattel·mortgage or otherwise, superior to the claims of the undersigned.'' The foregoing written instrument is signed, ''Rene Von Schleinitz, by Meredith and Harwood, his attorneys.''

The defendants W. J. Skeer and Ben Hurst declined to take or to assume possession of the leased premises. Thereupon plaintiff made certain repairs to the interior of the premises, and repaired or replaced some of the carpets, furniture and equipment of the hotel, and placed one Malone in charge of the premises, as manager of the hotel. The evidence shows that Malone, as manager for the plaintiff, has been operating the hotel since April 1, 1925 (and up to the time of the trial of the present action on January 15, 1926), making daily reports to plaintiff of the receipts and disbursements. According to

plaintiff's evidence, the net income, or net receipts, from the operation of the hotel, from the time the North Hotel Company relinquished possession of the leased premises until December 31, 1925, amounted to $2943.

With respect to the condition of the hotel building and equipment in March, 1925, plaintiff testified: "The place was in terrible shape. There were rooms where the plastering was coming down, and the wall paper was coming off, or hanging down. Half the hotel had no shades, either that or they were torn. The furniture and chairs were falling apart. There were no draperies. There were no linens left. Everything had been simply run down to the last, all the way through. The plumbing was all shot, the toilets bursted and over-flowed. It was no fit place to live in." Plaintiff testified further that the reasonable expenditures made by him in the making of necessary repairs to the interior of the hotel building and to the equipment thereof, in order to put the hotel premises in a livable and usable condition, aggregated $7,600.

There was some slight testimony (of a very general nature) proffered on behalf of the defendants, to the effect that Skeer, and perhaps others of defendants, had offered to put plaintiff in touch with (unnamed) prospective tenants who would pay a rental of $1000 per month for the hotel premises. For instance, the defendant W. J. Skeer testified: "He (plaintiff) came to see me, and I advised him that conditions in Kansas City were not like they had been here, and that it would be impossible for him to rent that hotel at the price he was asking; that I had three or four tenants that would be glad to take it on the basis of $1000 a month. Q. What did he (plaintiff) say? A. He would not listen to that kind of a rental. Q. What was the least rental he said he would take? A. I don't think that we discussed that." Respecting such proffers of prospective tenants, plaintiff testified: "Q. There were various parties who approached you when you came down here in the latter part of February or March, 1925, who wanted to take over the property at various sums, but I will ask you if there was anybody who made you any definite offer above $1000 a month for the balance of the term? A. No, sir. Q. Isn't it a fact that all of those offers were on the basis that you go in and put the hotel in shape, which would involve the expenditure of something like $17,500? A. Well, I don't think—they all seemed to be men that wanted to get information from me for some reason or another. Q. What I am asking: Was anybody willing to pay you $1000 even per month for the hotel in its condition, or were the offers based on the fact that you put the hotel in good condition? A. There was one offer, but in looking into the man I found he had no resources, but was absolutely unreliable. Q. Could you find any responsible party who would take the property, after it

was abandoned by the North Hotel Company, at $1000 a month in its then condition? A. I could not; no." None of such prospective tenants was produced as a witness at the trial by the defendants, nor was any testimony offered by defendants respecting the financial responsibility of any such (unnamed) prospective tenants.

The decree entered by the trial court contains the following findings: (1) That there is due plaintiff the sum of $2800 for rent actually accrued and owing under the terms of the original lease, as modified by the supplemental lease agreement, dated June 2, 1924; (2) that on or about March 3, 1925, the North Hotel Company surrendered possession of the leased premises to the plaintiff, together with all the personal property belonging to the North Hotel Company contained in said premises, and that on said date "plaintiff accepted the said premises and personal property from the North Hotel Company and then and there entered into immediate and exclusive possession of same and has continued in such possession and is now possessed thereof, all the while operating said premises and using the said personal property as and for a hotel by and through his personal representatives and agents for his sole and exclusive benefit, and accepting the usufruct derived therefrom, and declined to accept sundry good and responsible individuals as tenants of said property for the balance of the period covered by the lease, thereby terminating the relationship of landlord and tenant theretofore existing between said parties;" (3) that, by the supplemental lease agreement, dated June 2, 1924, "plaintiff has obtained from the North Hotel Company and has kept the cash deposit of $17,500 provided for in said lease and referred to in said supplemental agreement, and referred to in the chattel mortgage made by North Hotel Company to Ben Hurst, dated April 7, 1922, without the assent or knowledge of the defendants herein, and particularly defendant W. J. Skeer, owner of the chattel mortgage and of the balance of the indebtedness secured thereby, to-wit, $6000, thus depriving defendant Skeer and the other answering defendants herein of their equity and rights therein under the aforesaid chattel mortgage;" and (4) that defendants Lowry, Hurst, Colgrove, Secrest, and W. J. Skeer are entitled to a lien upon the aforesaid sum of $17,500, and upon the personal property described in the chattel mortgage aforesaid, subject only to a lien thereon in favor of plaintiff for the sum of $2800 rent, and interest thereon, as aforesaid. Wherefore, it is considered, ordered and adjudged by the trial court that "plaintiff have judgment for the sum of $2800, together with interest at six per cent per annum computed as follows: On $1400 from February 1, 1925, same being the due date thereof, and on the balance, to-wit, $1400, from March 1, 1925, the due date

thereof, and his costs herein incurred, and that the same is and constitutes a first lien upon the said sum of $17,500 and the personal property described in defendants' said Exhibit 1 (being the chattel mortgage of April 7, 1922), and that he have and recover same by deducting the said sum of $2800, together with interest as aforesaid, from the said sum of $17,500 in his possession, as aforesaid, or by subjecting the said personal property to sale at public auction to the highest bidder for cash at the said North Hotel in Kansas City, Missouri, after having given ten days' public notice in the Daily Record, published in Kansas City, Jackson County, Missouri, giving the terms of sale, place, day of week, month, year and the hour of the day on which such sale will take place, and after deducting from the proceeds of such sale all expense incident thereto, the costs of this action, and the amount of his lien as aforesaid, pay to defendant W. J. Skeer the sum of $6000, with interest thereon at the rate of seven per cent per annum from April 7, 1922 (making in all the sum of $7750 to June 7, 1926), in full satisfaction of said Skeer's lien as aforesaid. If, for any reason, the proceeds of such sale shall be insufficient to satisfy the judgment and lien of the plaintiff herein, together with costs herein and expenses incident to such sale, together with the judgment and lien of the defendant, W. J. Skeer, then, in that event, plaintiff shall satisfy such deficiency by paying same out of the said sum of $17,500 now in plaintiff's possession; and let execution issue herein.''

I. Appellant assigns error in the finding and conclusion of the trial court that, on or about March 3, 1925, the lessee, North Hotel Company, abandoned and surrendered possession of the leased premises, and that appellant accepted the surrender of the leased premises from the lessee, North Hotel Company, and entered into exclusive possession of the premises, and has continued in such exclusive possession, by operating and using the premises as a hotel for his sole and exclusive benefit, by reason of which conduct on the part of appellant the relation of landlord and tenant theretofore existing between appellant and the North Hotel Company was terminated. Appellant insists that the matter, or question, of an abandonment and surrender of the leased premises by the tenant, and an acceptance thereof by the landlord, must be determined from the intention of the parties, and that the evidence herein is wholly insufficient to establish the intention of the appellant to accept a surrender from the tenant, North Hotel Company, and therefore the finding and conclusion of the trial court respecting such matter is not supported by the evidence. Respondents, on the other hand, insist that, under all the evidence in the case, it is clear that there was a surrender of the

leased premises by the tenant, and an acceptance thereof by the appellant, by operation of law, in consequence of which the relation of landlord and tenant was terminated, with the resulting discharge and release of the tenant, North Hotel Company, from the payment of all unaccrued monthly rents for the remainder of the term of the lease.

While a surrender of the leased premises by the tenant, and an acceptance thereof by the landlord, must be consummated by mutual consent and agreement of the parties, yet such may be accomplished by implied, as well as by express, agreement of the parties. If accomplished by implied agreement of the parties, it is said to be done by operation of law, and the intention of the parties is to be implied from the acts and conduct of the respective parties, as disclosed by the attending facts and circumstances. "A surrender by operation of law occurs where the parties without express surrender do some act or acts from which it is necessarily implied that they have both agreed to consider the surrender as made—acts which are necessarily inconsistent with the continued relation of landlord and tenant. While it has frequently been said that whether a lease has been terminated by operation of law is a question of intention of the parties, it is, nevertheless, held that this mutual agreement may be implied upon the principle of estoppel from the acts of the parties, independently of, and even contrary to, their actual intent. The surrender or abandonment of a written lease may be inferred from the acts and conduct of the parties." [35 C. J. 1086.] "An abandonment of the premises by the tenant and an acceptance of the surrender by a resumption of possession by the landlord constitute a surrender by operation of law." [35 C. J. 1089.]

In Churchill v. Lammers, 60 Mo. App. 244, 248, SMITH, P. J., speaking for the Kansas City Court of Appeals, said: "A surrender, by operation of law, takes place when the parties, without express surrender, do some act which implies that they both agreed to consider the surrender as made. . . . The rule of law is said to be now settled that any acts which are equivalent to an agreement on the part of the tenant to abandon, and on the part of the landlord to resume possession of the demised premises, amount to a surrender by operation of law. [Talbot v. Whipple, 14 Allen, 177.] A surrender may be inferred from the circumstances and conduct of the parties, evincing that they both agree to consider a surrender as made. [Huling v. Roll, 43 Mo. App. 234; Beall v. White, 94 N. S. 382; Bedford v. Terhune, 30 N. Y. 453; Fry v. Partridge, 73 Ill. 51; McGlynn v. Brock, 111 Mass. 219.]"

While the juristic authorities are in accord in holding that a surrender and an acceptance by operation of law occur when the acts

and conduct of both the landlord and the tenant are such as to be the equivalent of a mutual agreement on their part to treat the surrender as made by the tenant and as accepted by the landlord, the authorities are somewhat in conflict respecting what particular acts or conduct on the part of the landlord are sufficient to raise the implication that the landlord has acquiesced and consented to a surrender of the leased premises by the tenant. It appears to be the weight of juristic authority, however, that, in order to prevent an acceptance of a surrender by operation of law, the landlord must, either by word or by act, convey to the tenant notice that the landlord resumes possession of the premises for the benefit of the tenant, and not for the benefit of the landlord.

The prevailing rule is thus stated in 16 Ruling Case Law, pages 970-972, sections 482, 483: "If the landlord re-enters and resumes the beneficial use and enjoyment of the premises, he thereby terminates the lease in so far as his right to recover subsequently accruing rents is concerned; but his re-entry will not affect the tenant's liability for rent accrued at the time of such re-entry. . . . In case the landlord resumes possession of the abandoned premises and relets, or attempts to relet, them on his own account, under such circumstances that it is fair to assume that he does not intend to look to the tenant for the future rent or any part thereof, he thus accepts the surrender and relieves the tenant from his obligation. . . . According to the broad view taken by the majority of the cases in this country, upon the abandonment of the premises by a tenant the landlord may refuse to accept a surrender, and *after notice to the lessee of his intention to do so,* relet the premises for the best rent obtainable, and recover the difference between the rent reserved in the lease and the rent received from the subsequent tenant. . . . But according to the better view, even in such jurisdiction, *the reletting must be done by the landlord upon notice to the tenant that it is for the latter's benefit and to minimize the damages, and that the landlord does not relinquish his claim to the rent.*" (Italics our own.)

Thus, it is said by Judge Leonard A. Jones, in his standard treatise on the Law of Landlord and Tenant (1906 Ed.), section 550, pages 616-617: "It is essential that the landlord notify his tenant that his responsibility for the deficiency in rent will continue. So, where the tenant on leaving recognized the lease and offered to surrender, and the landlord entered and relet without notice to the former lessee, this operated as a surrender by operation of law. It is to be presumed that the landlord has given up all hope to hold the tenant for the balance of rent when he enters into possession and deals with the property as an owner. So where a tenant voluntarily vacated the

premises before the expiration of the term and delivered the keys to the landlord at the latter's request, who retained them and during the term advertised the premises for rent, an implied surrender arose by operation of law. . . . In case there is nothing to indicate a purpose on the part of the landlord in resuming possession to hold the tenant liable for rent or to lease to others on account of the tenant, he merely accepts the abandonment as a surrender of the leasehold interests and thereby puts an end to the contract.''

In Baker v. Eilers Music Co., 26 Cal. App. 371, 146 Pac. 1056, 1057, it is said: ''A lease may be brought to an end by the surrender of the leased premises and the acquiscence in such surrender by the lessor. Such acquiescence is perhaps best evidenced by his taking possession of the property and assuming again all of the authority over it of an owner in possession. . . . A lessor, who takes possession of property delivered to him by his tenant, and does so unqualifiedly, thereby releases his tenant.''

In Bernard v. Renard, 175 Cal. 230, 233, the Supreme Court of California, en Banc, quotes approvingly from Rehkopf v. Wirz, 31 Cal. App. 695, as follows: ''Where a tenant abandons the leased property and repudiates the lease, the landlord may accept possession of the property for the benefit of the tenant and relet the same, and thereupon may maintain an action for damages for the difference between what he was able in good faith to let the property for and the amount provided to be paid under the lease agreement. [Bradbury v. Higginson, 162 Cal. 602, 123 Pac. 797.] But a lessor who chooses to follow that course must in some manner give the lessee information that he is accepting such possession for the benefit of the tenant, and not in his own right and for his own benefit. If the lessor takes possession of property delivered to him by his tenant and does so unqualifiedly, he thereby releases the tenant. [Baker v. Eilers Music Co., 26 Cal. App. 371, 146 Pac. 1056; Welcome v. Hess, 90 Cal. 507, 27 Pac. 369.] An unqualified taking of possession by the lessor and reletting of the premises by him as owner to new tenants is inconsistent with the continuing force of the original lease.''

A case somewhat similar upon the evidentiary facts to the instant case is Producers Packing Co. v. Fischer, 221 Mo. App. 639, 283 S. W. 747, recently ruled by the Kansas City Court of Appeals. The action was upon a bond, given by defendants, as sureties, to secure the faithful performance by the lessee of a lease between plaintiff, as lessor, and one Branson, as lessee. Plaintiff leased to Branson, for a term of two years, a part of its packing plant, used for an ice-manufacturing plant. The lease required the lessee, Branson, to operate the ice plant, and to furnish refrigeration for cer-

tain cold-storage rooms in the plaintiff's packing plant and to keep the same at certain required temperatures, and also to furnish steam to the packing plant for the operation of plaintiff's machinery and for the operation of the heating system in the packing plant. While the lessee, under the terms of the lease, was not obligated to pay a cash rental for the use of the ice plant, the lessee, however, agreed to pay as rent the sum of $250 per month for the use of a deep well and a pump, furnished by plaintiff lessor for the purpose of supplying water for the manufacture of ice by the lessee, Branson. Branson defaulted in the payment of the monthly rent for the use of the pump and deep well, and abandoned the ice plant. Said the court, in ruling that the abandonment and surrender of the leased premises by the lessee had been accepted by the plaintiff by operation of law: ''The ice plant was a part of the packing plant and the former and its equipment were the only means available for the furnishing of refrigeration and steam to the packing plant; it could not be operated without refrigeration and steam. This was known to the defendant and was within the contemplation of the parties at the time the lease and bond were executed. It was also known that if the lessee should fail or cease to furnish refrigeration or steam, plaintiff would be compelled to take possession of the ice plant and operate the same or shut down its packing plant, and it was in contemplation of the parties at the time the lease and bond were executed and delivered that plaintiff would take over the ice plant in the event that Branson ceased to furnish refrigeration or steam. . . . Branson took possession of the ice plant under the lease on June 24, 1923, but did not pay any rent for the pump and deep well, and in September, 1923, departed from Sedalia, leaving the ice plant in full operation, and has not been heard of since. He made no arrangements for further payment of the employees, and left no fuel with which to operate the ice plant. Plaintiff was forced to retake possession of the ice plant and operate the same. On September 13, 1923, plaintiff exercised its option to forfeit the lease and took possession of the property because of the failure of Branson to perform the conditions to pay said rent described in the lease. Plaintiff has continued in the possession and operation of the ice plant. The premises were a part of the packing plant and under the terms of the lease the lessee was required to give technical and expert service to plaintiff. The property was not of such nature that it could be re-rented and for this reason no effort has been made to re-rent it. Branson failed to pay any of the $250 monthly payments. . . . Defendants, however, claim that plaintiff, upon the abandonment of the premises and equipment by Branson, having forfeited the lease and taken possession of the premises and operated the ice plant and

machinery, elected to terminate the lease on September 13, 1923; that plaintiff's conduct terminated the lease and with it all unaccrued liabilities of the lessee upon his covenants and stipulations in the lease dependent upon the continuance of the term; that the principal not being liable for these, the sureties are not; that plaintiff is now suing for damages suffered after re-entry, and cannot recover the same, but the only items of damage that it may recover . . . is for the rent and liabilities accruing previous to the re-entry. We think there is no question but that defendants' contention is well taken (citing authorities)."

In Armour Packing Co. v. Des Moines Pork Co., 116 Iowa, 723, 725, 89 N. W. 196, it is held that a landlord who, after the abandonment of the leased premises by the tenant, re-enters and takes possession for himself, without indicating to the tenant a purpose to hold him for the rent, accepts the abandonment as a surrender of the lease by operation of law. Said the court therein: "In such a case there is nothing to indicate a purpose on the part of the landlord in resuming possession to hold the tenant liable for the rent or to lease to others on account of the tenant. He merely accepts the abandonment as a surrender of the leasehold interests, and thereby puts an end to the contract."

In Saracena v. Preisler, 167 N. Y. Supp. 871, 874, plaintiff sued to recover the unaccrued monthly rents for certain leased premises used for a Turkish bath, which were a part of the adjoining premises used by plaintiff as a barber shop, the leased premises having been abandoned by the defendants and the possession and use thereof having been resumed by plaintiff. Said the court, in denying plaintiff a recovery for the unaccrued monthly rents for the balance of the term of the lease: "It is true that there was no offer on the part of the defendants to terminate the lease, which offer as such was accepted by the plaintiff; but an abandonment of the premises, coupled with a refusal to pay rent, when acted upon by the plaintiff in such manner as to show that he intended to resume control for his own benefit, and not for the benefit of the out-going tenants, is equivalent to surrender by operation of law. Clearly a landlord cannot resume possession of premises abandoned by a tenant, and, while using the premises for his own personal benefit, hold the tenant for rent. Ordinarily in such cases it is a question of fact whether the landlord resumed possession for his own benefit, or to relet as agent for the tenant, and the issue depends upon all of the surrounding circumstances. In this case, however, there is not an item of evidence from which it could be inferred that the plaintiff did not resume possession for his own exclusive benefit."

In Sharon v. American Fidelity Co., 172 Mo. App. 309, 315, 157 S. W. 972, the late Judge Ellison, speaking for the Kansas City Court of Appeals, after a review of numerous authorities bearing upon the subject under consideration, announced: "But the law seems the same (at least we will concede it is the same) even though the lessee is at fault and the landlord may rightfully enter and declare a forfeiture. Rent is a compensation for the use and occupation of the premises and, in the absence of a contrary provision, when the latter ceases, rent does also. So, if the landlord, confronted with the lessee's default and knowing his remedies, elects to exercise that which destroys the relation, terminates the tenancy and avoids the lease, he deprives himself of any right to rent accruing after his severance of the relation and taking back the property (citing authorities)."

Appellant, in support of his claim of error herein, has cited numerous decisions by the courts of this State, and of other jurisdictions, to the effect that, upon abandonment of the leased premises by the tenant, the landlord has the election either to permit the premises to remain vacant until the end of the term, and then sue for recovery of the stipulated rents, or he may mitigate the loss of rents by getting what he can out of the premises; and that, when an implied intention (by reason of the acts and conduct of the landlord) to accept a surrender of the leased premises cannot be presumed without doing violence to reason and common sense, the implication or inference of intention fails for want of support. We have carefully read and considered all of the several authorities cited by appellant, but an analysis thereof discloses that, in most of the cited cases, it appears that the landlord, upon resuming possession of the abandoned premises, either protested to the tenant against resuming possession and relieving the tenant of his liability for the payment of future and unaccrued rents, or informed the tenant that the landlord was resuming possession of the premises for the benefit, and for the account, of the tenant, and would look to the tenant for the payment of any loss or deficiency of the stipulated rents in the event of a reletting of the premises.

We have searched the record herein in vain for any evidence, however slight, tending to show that the plaintiff, Von Schleinitz, or any agent on his behalf, protested to the tenant and lessee, North Hotel Company, against the abandonment and surrender of the leased premises, or that plaintiff, Von Schleinitz, informed the tenant, North Hotel Company, or any representative or agent thereof, that plaintiff resumed possession of the leased premises for the benefit and account of the North Hotel Company, and would look to such corporate tenant for the payment of any loss or deficiency of the stipulated rents. It is true that plaintiff testified that, when he was

advised that the North Hotel Company was abandoning the premises and he came to Kansas City from Milwaukee, in February or March, 1925, to resume possession of the premises, he found one Long, an employee or agent of the North Hotel Company, in charge of the hotel premises, and that plaintiff could not find any other person representing the North Hotel Company who would take the hotel. But there is not a scintilla of evidence that plaintiff made any protest to Long against resuming possession of the premises, or that plaintiff informed or notified Long, as the agent and representative of the North Hotel Company, that plaintiff was taking possession of the premises for the benefit and account of the North Hotel Company, and would hold the North Hotel Company, as tenant, liable for the payment of any loss or deficiency of the future and unaccrued rents. While the evidence shows that plaintiff made a written tender of possession of the premises to the defendants Hurst and Greer, neither of those individuals was shown by the evidence to be an officer, stockholder or agent of the North Hotel Company (at the time of the written tender of possession), and consequently a tender of possession to either of the said individuals was in no sense a tender to the corporate tenant, North Hotel Company. Furthermore, the written tender of possession made to defendants Hurst and Greer contains no recital or statement to the effect that plaintiff has resumed actual possession of the hotel premises under protest, or that possession of the premises is taken and resumed by plaintiff for the benefit and account of Hurst and Greer, or of the tenant, North Hotel Company, or that plaintiff will hold Hurst, Greer, or North Hotel Company, liable for any loss or deficiency of the unaccrued and future rents. The evidence does show, however, that plaintiff did take actual and exclusive possession of the premises, and that plaintiff, on April 1, 1925, placed one Malone in charge and custody of the premises, as manager for the plaintiff, since which date the plaintiff, by and through his manager, Malone, has operated the hotel, as the owner thereof, Malone making daily reports to plaintiff of the receipts and disbursements in the operation of the hotel.

We think there is ample and sufficient evidence upon which to predicate the finding and conclusion of the trial chancellor that the surrender of possession of the leased premises by the tenant, North Hotel Company, was accepted by the appellant landlord, Von Schleinitz, by operation of law, and that the relation of landlord and tenant was thereby terminated, in consequence of which the plaintiff and appellant is not entitled to a recovery of the stipulated monthly rents from and after the month of March, 1925. Appellant's assignment of error must therefore be denied.

II. Appellant assigns error in the finding and conclusion of the trial court that the deposit of $17,500 (paid to the original lessor, Mehornay, by the original lessees, Josephson, as advanced rental under the terms of the original lease and the several agreements collateral and supplemental thereto, and which deposit is now held by the appellant herein) is subject to the lien of the chattel mortgage of April 7, 1922, given by the North Hotel Company, as mortgagor, to Ben Hurst, as mortgagee, which chattel mortgage has been assigned to the defendant W. J. Skeer, who is the present owner and holder thereof. Appellant's claim of error would seem to be grounded upon the provision contained in the collateral agreement of July 5, 1919, wherein the original deposit of $15,000 (later increased to $17,500) was created, which provision is to the effect that, "should the lease aforesaid in any way terminate, or be terminated, *without fault on the part of the lessees in said lease named, or of the corporation* (North Hotel Company), provision for an assignment of lessees' interest to which (corporation) is in said lease made, the said sum of $15,000 (increased to $17,500), or so much of same as may be due lessees, shall be repaid to said lessees, or to said corporation (North Hotel Company," etc. Appellant seemingly argues that, inasmuch as the afore-quoted provision of the collateral agreement of July 5, 1919, requires that the said deposit of $17,500 shall be repaid by the original lessor, Mehornay, or by his assigns, to the original lessees, Josephson, or to their corporate assignee, North Hotel Company, only in the event that the lease be terminated *without fault on the part of the lessees,* Josephson, and of their corporate assignee, North Hotel Company, and inasmuch as it clearly appears that the lease was terminated because of the abandonment of the leased premises by the corporate lessee, North Hotel Company, and therefore was terminated by and through *the lessee's fault,* there is no obligation or liability whatsoever on the part of the appellant to repay to North Hotel Company, or to any party claiming under and through said corporation, any part of said deposit of $17,500. Appellant further-more argues that the "Consent to Mortgage," dated February 2, 1921, by and between the original lessor, Mehornay, and the original lessees, Josephson, specifically provides that 'no chattel mortgage lien, or other lien, so given, created or received upon the hotel equipment, and *no assignment of lessees' rights in or concerning the same, or said money deposits,* shall be otherwise than expressly subject to the lien and liens and all rights, title, and interest of the said lessor (Mehornay), his heirs and assigns, and his grantees, in, to, upon and concerning said hotel equipment *and money deposits."* Hence, it is seemingly claimed by appellant that, under the terms

and provisions of the collateral agreement of July 5, 1919, and the "Consent to Mortgage," dated February 2, 1921, the North Hotel Company had no right or authority to create a chattel mortgage lien upon and against the deposit of $17,500, without such chattel mortgage lien being subject and inferior to the right of the lessor, Mehornay, and his assignee and grantee, the appellant herein, to hold and retain such money deposit, without liability or obligation to repay the same to the North Hotel Company, except only in the event that the lease be terminated *without fault* on the part of the lessee, North Hotel Company, which stipulated event has not occurred, and cannot now occur. The original lease of July 5, 1919, provides that "the sum of $15,000 (later increased to $17,500) paid as advance rent, . . . shall be bound by and subject to the payment of the rent herein provided for, and the performance of the other terms and conditions of this lease;" and the chattel mortgage of April 7, 1922, by which the North Hotel Company, as mortgagor, did "assign, transfer and set over to said Ben Hurst, as mortgagee, . . . all the right, title and interest of the said North Hotel Company in the said deposit of $17,500", contains the specific provision that "this mortgage (is) being given subject to the lien created in said lease from Mehornay to (the) Josephsons."

The rights, claims and interests of the respective parties in and to the deposit of $17,500 were thus fixed and determined by the above-quoted provisions of the aforesaid instruments, prior to June 2, 1924. On the latter date, however, the appellant, Rene Von Schleinitz, as lessor, and the North Hotel Company, as lessee, entered into a written agreement, whereby the lessor, Rene Von Schleinitz, agreed to a reduction in the amount of the monthly rentals to be paid by the North Hotel Company for the leased premises, in consideration of which the North Hotel Company waived any and all claim of every kind and nature in and to the advanced rental deposit of $17,500, and wherein it was further agreed by and between the appellant and the North Hotel Company that "all references to said $17,500, and all covenants, agreements and obligations between the parties hereto, or their predecessors in interest, involving said sum ($17,500) and every part thereof," wherever contained in any of the prior lease agreements, and collateral and supplemental contracts, "are hereby cancelled and henceforth considered as of no force or effect." The two parties (Von Schleinitz and North Hotel Company) to the written agreement of June 2, 1924, unquestionably had the right to contract (as between themselves) respecting the ownership and disposition of the deposit of $17,500, but such agreement on their part could not bind the defendant W. J. Skeer, or affect any right, claim or interest (in and to such money deposit) of the defendant

W. J. Skeer, as the assignee of the chattel mortgage given by the North Hotel Company on April 7, 1922, and as the owner of the several promissory notes secured thereby. The claim and interest of the defendant W. J. Skeer, in and to the deposit of $17,500, is fixed and determined by the chattel mortgage of April 7, 1922, and such claim and interest of Skeer in and to the deposit of $17,500 was not affected, diminished, or enlarged, by the written agreement of June 2, 1924, by and between appellant and the North Hotel Company, to which latter agreement Skeer was not a party, and to the making of which agreement he did not give his consent, and which agreement was seemingly made without his knowledge. By their written agreement of June 2, 1924, the appellant and the North Hotel Company cancelled and expunged (from the prior and pre-existing lease agreements and collateral contracts) all references (therein contained) to the deposit of $17,500, together with all covenants, agreements and obligations between said two named parties, or their predecessors in interest, involving said deposit and every part thereof, and thereafter any references, convenants, agreements and obligations respecting such money deposit, as contained in the prior instruments, were to be of no further force or effect. Having agreed to a cancellation and expunction of all references, covenants, agreements and obligations contained in the prior instruments respecting said money deposit, the appellant, Von Schleinitz, cannot now claim the right, under a cancelled covenant, to withhold and retain such money deposit (because of the termination of the lease through the *fault of the lessee*, North Hotel Company) free from the lien of the chattel mortgage of April 7, 1922. The right, claim or interest (in and to the deposit of $17,500) of the defendant W. J. Skeer, as the owner and holder of the unpaid notes secured by the chattel mortgage of April 7, 1922, is determinable and limited, however, by the terms and provisions of the chattel mortgage, which instrument recites that it is "given subject to the lien created in said lease from Mehornay to Josephson." The original lease from Mehornay to Josephson provides that the "sum of $15,000 (increased to $17,500) paid as advance rent . . . shall be bound by and subject to the payment of the rent herein provided for." The acceptance by appellant (by operation of law) of the surrender of the leased premises by the tenant, North Hotel Company, terminated the relation of landlord and tenant theretofore existing between said parties, in consequence of which the North Hotel Company was relieved of its liability for payment of the stipulated rents accruing after the month of March, 1925. The deposit of $17,500, by virtue of the provisions of the original lease agreement, was bound for the payment of the accrued rents ($2800) for the months of February

and March, 1925, and the chattel mortgage of April 7, 1922, insofar as such chattel mortgage constitutes a lien in favor of the defendant, Skeer, upon and against said money deposit, is inferior and subject to the lien of appellant for the accrued rents ($2800). Such is the substance and effect of the finding and conclusion of the trial chancellor. The finding and conclusion of the trial chancellor on such matter is free from error, and the assignment or claim of error made by appellant must be denied.

III. Appellant furthermore urges that the chattel mortgage, dated April 7, 1922, and executed by the North Hotel Company, as mortgagor, in favor of Ben Hurst, as mortgagee, which chattel mortgage and the promissory notes secured thereby have been sold, assigned and transferred, for a valuable consideration, and before the maturity of any of said notes, to the defendant W. J. Skeer, is null and void, and is therefore not a valid or enforcible lien against the furniture, fittings and equipment of the North Hotel Company, or against the deposit of $17,500, for the reason that the chattel mortgage (which is signed on behalf of the North Hotel Company, and acknowledged, by E. H. Lowry, as the president of said corporation) shows upon its face that it was made and given by the corporation, North Hotel Company, to secure the personal indebtedness of its then stockholder and president, E. H. Lowry, to a third person, as is evidenced by the nineteen promissory notes of said Lowry, made by him as an individual, in favor of the said Ben Hurst, the payment of which notes is secured by said chattel mortgage; that it is *ultra vires* the corporate mortgagor to mortgage and pledge its corporate property and assets to secure the payment of the personal indebtedness of one of its stockholders and officers, especially when it is made to appear that such personal indebtedness of the stockholder of the corporation arises out of the purchase, by such stockholder from such third person, of the capital stock of the corporation, or when it does not appear that the corporation received some pecuniary benefit or consideration by reason of the chattel mortgage transaction. Hence, it is urged by appellant that the trial court erred in finding and holding that the chattel mortgage of April 7, 1922, constitutes a valid and subsisting lien against the furniture, fittings and equipment of the North Hotel Company, and against the deposit of $17,500.

Respondents counter the foregoing contention of appellant by insisting that no such issue or question was raised or presented by the pleadings of the respective parties, and that no such issue was tried and submitted to the chancellor below. The bill, or petition, filed

by the appellant, neither avers specifically that the execution and delivery of the chattel mortgage by the North Hotel Company was an act *ultra vires* the corporation, nor does the petition allege and set out any facts from which an act *ultra vires* the corporation may be inferred. Nor does the petition charge that the North Hotel Company received no pecuniary benefit or consideration for the execution and delivery of the chattel mortgage. While the separate answers of the several defendants plead the execution, delivery and recording of the chattel mortgage, and aver that the chattel mortgage constitutes a paramount and superior lien upon the furniture, fittings and equipment of the North Hotel Company, and upon the deposit of $17,500, the record does not show that the plaintiff and appellant filed a reply to any of the separate answers. Appellant insists, however, that a reply to the separate answers, in the nature of a general denial, should be deemed as though filed upon the submission of the cause *nisi*.

According to the weight of juristic authority, the plea or defense of *ultra vires* is affirmative and special, and must be specifically pleaded in order to be available. [14a C. J. 841, 842.] Such plea or defense cannot be raised by a general denial. [Idem.] Such appears to be the prevailing and settled rule in this jurisdiction. [Young Men's Christian Assn. v. Dubach, 82 Mo. 475, 481; Glendale Lumber Co. v. Beekman Lumber Co., 152 Mo. App. 386, 392.] The same rule prevails in other and foreign jurisdictions. [Mehelin v. Carlson, 17 Idaho, 742, 107 Pac. 755, 762; Commercial Bank v. King, 47 Iowa, 64; Wallace Bank & Trust Co. v. First National Bank, 40 Idaho, 712, 237 Pac. 284, 287.] Furthermore, there are respectable judical authorities to the effect that a creditor of a corporation (such as plaintiff herein) will not be permitted to question or attack a corporate transaction merely on the ground that such transaction is *ultra vires* the corporation, unless such creditor specially and affirmatively pleads and proves that the *ultra vires* transaction was fraudulently conceived and accomplished for the purpose of avoiding and defeating the corporate debt owing to the creditor, the plea or defense of *ultra vires* being usually restricted and available only to the corporation itself, or to its stockholders, or, in a proper case, to the State or sovereignty from which it obtained its charter and corporate existence. [Force v. Age-Herald Company, 136 Ala. 271, 278, 33 So. 866; Brent v. Simpson, 238 Fed. 285, 291; Memphis Lumber Co. v. Security Bank & Trust Co. (Tenn.), 226 S. W. 182, 184.] Appellant does not charge in his petition, nor has he attempted to prove, that the execution and delivery of the chattel mortgage by the North Hotel Company was done with the intent and for the purpose of defrauding the creditors of the corporation, including appellant; nor does

appellant charge in his petition, nor has he attempted to prove, that the execution and delivery of the chattel mortgage rendered the corporation insolvent. In truth, so far as the record herein discloses, the corporation seemingly paid its obligations from and after the execution of the chattel mortgage on April 7, 1922, until the month of January, 1925, a period of almost three years following the execution and delivery of the chattel mortgage.

There is no evidence whatsoever in the record before us that the corporate mortgagor, North Hotel Company, did not receive some pecuniary benefit or consideration by reason of the transaction. Nor is there any competent evidence, binding upon the defendant W. J. Skeer, that the personal promissory notes made by E. H. Lowry, as an individual, the payment of which notes is secured by said chattel mortgage, were given to the mortgagee, Ben Hurst, in consideration for the sale, by Hurst to Lowry, of the capital stock of the corporate mortgagor, North Hotel Company. It is true that the plaintiff and appellant offered in evidence, upon the trial of the action, an abandoned answer of the defendant Ben Hurst, wherein it was averred by the defendant Hurst, that the nineteen promissory notes secured by the chattel mortgage were ''given by said E. H. Lowry to Ben Hurst for a part of the purchase price of the capital stock of the said North Hotel Company.'' But while such pleaded admission may be admissible as against the defendant Hurst, obviously such admission is not admissible as against the defendant W. J. Skeer, who is the holder, in due course and for value, of the chattel mortgage and the promissory notes secured thereby. An admission by Hurst cannot be binding against Skeer, and hence, insofar as the rights of the defendant W. J. Skeer, are concerned, there is no competent evidence in the record that the chattel mortgage was given to secure an indebtedness of Lowry to Hurst arising out of a purchase or sale of the capital stock of the North Hotel Company.

But appellant argues that, inasmuch as the defendant W. J. Skeer, by his separate answer herein, has affirmatively pleaded that the chattel mortgage of April 7, 1922, is a valid and subsisting lien against the furniture, fittings and equipment of the North Hotel Company, and against the deposit of $17,500, and prays for an order declaring said chattel mortgage to be and to constitute a first, prior and superior lien upon the mortgaged personal property of the North Hotel Company, and upon said deposit of $17,500, and inasmuch as the judgment and decree of the trial court granted to said defendant W. J. Skeer a measure of affirmative relief, the burden therefore rested upon the defendant W. J. Skeer, under the circumstances, to affirmatively show and establish, by competent evidence, that some pecuniary consideration or benefit moved to the corporate mortgagor,

North Hotel Company, for the execution of the chattel mortgage. In support of such contention, the appellant relies upon what was said by this Division of this court in ruling the case of Potts-Turnbull Advertising Co. v. Gatchell, 257 S. W. 134, 139. We have carefully reviewed and analyzed the cited case, but we regard the cited case as having no bearing or application upon the point now under consideration in the instant cause. The nature and purpose of the cited action, and the issues raised by the pleadings of the respective parties therein, were such that our reasoning and conclusion therein are wholly inapplicable to the instant case.

As a general rule, a party who resists or defends against an instrument in the nature of a contract, upon the ground of want of consideration, must affirmatively and specially plead no consideration, and such party cannot avail himself of such defense to the instrument under the general issue, or a general denial; and the rule is especially applicable where the instrument imports a consideration. [13 C. J. 740-741.] The principle is said to be universally recognized that a chattel mortgage imports, or implies, a consideration, so that the mere introduction of a chattel mortgage in evidence constitutes prima-facie evidence that it was given by the mortgagor for a consideration moving to the mortgagor. Unless rebutted by evidence, the prima-facie presumption of consideration is not overthrown. [11 C. J. 451.] Thus, in Strop v. Hughes, 123 Mo. App. 547, 555, wherein plaintiff sued in replevin for personal property, basing his claim upon a chattel mortgage, covering such property, executed and delivered by a corporate mortgagor, and the defendant, who claimed the right to possession of the personal property by virtue of a seizure under a writ of attachment issued in a suit brought by a creditor against the corporate mortgagor, contended that the chattel mortgage was void for want of consideration, it was said by the court in disposing of defendant's contention: "In the absence of proof to the contrary, the law implies a consideration."

We are of the opinion that the chattel mortgage of April 7, 1922, given by the North Hotel Company, as mortgagor, to Ben Hurst, as mortgagee, imports a consideration and benefit moving to the mortgagor therefor, and that it devolved upon the plaintiff and appellant, Von Schleinitz, to overthrow the prima-facie presumption of consideration for the execution of such chattel mortgage by evidence in rebuttal of the presumption. No such evidence was proferred by the appellant herein. The trial court, in our opinion, did not err in the finding and conclusion that the chattel mortgage of April 7, 1922, assigned to, and owned by, the defendant W. J. Skeer, is a valid and subsisting lien upon the furniture, fittings and equipment of the North Hotel Company, and upon the money deposit of $17,500. Appellant's assignment of error must be denied.

1146

IV. Lastly, it is contended by appellant that the trial court erred in not allowing plaintiff a recovery and judgment for the amount of money expended by him in restoring the hotel premises to a livable and usable condition, and in not adjudging the same to be a paramount and superior lien against the furniture, fittings and equipment of the hotel, and against the deposit of $17,500. Under the terms and provisions of the original lease of July 5, 1919, the original lessees, Josephson, the assignors and predecessors in interest of the subsequent tenant, North Hotel Company, covenanted with the landlord, and his assigns and grantees, "to take good care of said premises, and keep the interior of same in good repair, usual wear and providential destruction excepted, . . . and to repair all injury or damage done or occasioned to said premises by their neglect; and at the expiration of the term . . . , whether terminated by lapse of time or otherwise, to surrender to lessor . . . possession of said premises hereby let, with all appurtenances and fixtures, in as good condition as same were when taken possession of, usual wear and tear and damage or destruction by fire, proceedings at law, or by any providential means excepted; . . . and should the lessees fail to make, or cause to be made, any repairs to the demised premises, or to said property, which the lessees ought to make, and fail to make, the lessor . . . may pay the cost thereof, and add the amount or amounts so paid, together with interest thereon at the rate of eight per cent per annum from date of payment, to the installment of rent next thereafter falling due under this lease." The original lease further provides that the furniture, fittings and fixtures, and all of the property of the lessees upon the leased premises, together with the money deposit of $15,000 (increased to $17,500), "shall be bound by and subject to the payment of the rent herein provided for, *and the performance of the other terms and conditions of this lease.*" The plaintiff's evidence tended to show that there was a breach of the above-quoted covenant to repair on the part of the lessee and tenant, North Hotel Company, and that, at the time of the abandonment and surrender of possession of the premises by such tenant, the premises were in such a state of disrepair as to be unfit for use. If such be the fact, then the breach of the covenant to repair occurred prior to the acceptance of the surrender of the premises by the appellant, and the pecuniary liability or obligation of the tenant to pay and reimburse the landlord for the cost of the repairs which the tenant failed to make, and ought to have made, together with interest thereon at eight per cent per annum from date of payment of the cost of such repairs by the landlord, arose before the acceptance by the landlord of a surrender of the premises, and before the relation

of landlord and tenant was terminated by operation of law. In other words, the pecuniary liability of the tenant, North Hotel Company, arising out of its breach of the covenant to repair the premises, had accrued prior to the surrender of the premises by the tenant, and the acceptance thereof by the landlord, although the amount and extent of such pecuniary liability of the tenant was not determinable until after the relation of landlord and tenant was terminated by operation of law, and until the appellant had caused the necessary repairs to be made, and had paid the cost thereof. The appellant, in our opinion, is clearly entitled to a recovery of the amount of the cost of the repairs, together with interest thereon as stipulated in the original lease, made necessary by the breach by the tenant of the covenant to repair, and to have such amount declared to be a paramount and superior lien upon the furniture, fittings and equipment of the hotel, and upon the deposit of $17,500. The trial chancellor therefore erred in failing to include and allow such recovery in the judgment *nisi,* and in failing to declare and adjudge the amount expended by appellant (in causing to be made such repairs to the interior of the premises as the tenant, North Hotel Company, was obliged and required to make under the covenants of the lease) to constitute a paramount and superior lien upon the personal property and deposit of $17,500, which property was bound under the terms of the original lease for the performance of the covenant to repair.

The evidence on behalf of appellant was to the effect that he had expended the approximate sum of $7,600 in "reconditioning" the hotel premises, but it appears from the evidence that a considerable portion of such sum was expended for the replacement and repair of the furniture, carpets, and similar equipment of the hotel. We find no covenant in the lease requiring and obligating the lessee to keep the furniture, fittings and equipment of the hotel in good repair; nor do we find any provision in the lease authorizing the lessor to make repairs to, or replacements of, such personal property. The covenant on the part of the lessee was "to take good care of *said* (hotel) *premises,* and keep the *interior* of same in good repair, and to repair all injury or damage done or occasioned to *said premises* by their neglect." Inasmuch as the judgment *nisi* must be reversed, and the cause remanded, for failure of the trial court to include in the judgment an allowance and recovery to the plaintiff of the amount expended by him by reason of the tenant's breach of the covenant to repair, the circuit court should therefore ascertain and determine, from further and additional evidence, if such be necessary, the amount actually expended by plaintiff in causing to be made such necessary repairs (only) *to the interior of the hotel premises* as the

lessee, North Hotel Company, was obliged to make and pay for, under the terms of the original lease of July 5, 1919, and thereupon the circuit court should allow plaintiff, Rene Von Schleinitz, a recovery and judgment for such ascertained amount, together with interest thereon at the rate of eight per cent per annum from the date of payment by plaintiff of the cost of such necessary repairs, against the defendant North Hotel Company, and should adjudge and declare the same to be and to constitute a first lien upon and against the furniture, fittings and equipment contained within the described hotel premises, and against the money deposit of $17,500.

Furthermore, the decree and judgment, as entered by the circuit court on June 28, 1926, allows the defendant W. J. Skeer a recovery of interest at the rate of seven per cent (7%) per annum from April 7, 1922 (the date of the chattel mortgage from North Hotel Company to Ben Hurst), computed upon the principal sum of $6000, representing the principal of the twelve unpaid notes of $500 each, secured by said chattel mortgage, such interest amounting to $1750. According to the terms of the chattel mortgage of April 7, 1922, the several notes secured thereby bore interest from their date, April 7, 1922, at the rate of seven per cent (7%) per annum, the interest being payable *semi-annually*, on October 7 and April 7 of each year, until the principal of said notes has been fully paid. The defendant W. J. Skeer testified on the trial of the present action that default in the payment of the said notes occurred on January 15, 1925, but defendant Skeer did not testify that there was any default in the payment of interest due upon said upaid principal sum. There is no evidence whatsoever in the record that the semi-annual interest (upon the several chattel mortgage notes) due October 7, 1924, and prior thereto, was not paid. Appellant insists, therefore, that the decree and judgment of the circuit court is erroneous, and wholly unsupported by the evidence, in allowing the defendant W. J. Skeer, interest upon the principal amount of the unpaid chattel mortgage notes computed from their date, April 7, 1922, instead of being computed from the last semi-annual interest payment date prior to the date of default, the same being October 7, 1924. It would appear that appellant is correct in such contention, so far as the present record discloses. The circuit court should therefore ascertain and determine whether any interest has been paid upon the principal amount of the unpaid chattel mortgage notes since the date of the execution and delivery of said notes, April 7, 1922, and, if so, then the defendant W. J. Skeer is entitled only to a recovery of interest upon the principal amount of the unpaid chattel mortgage notes computed from the last date upon which the interest thereon was paid; in other words, the appellant herein,

Rene Von Schleinitz, is entitled to a credit of whatever amount of interest has been paid upon the principal amount of the unpaid chattel mortgage notes since April 7, 1922, the date of execution of said notes, as such amount of interest so paid is ascertained and determined by the circuit court. In all other respects, however, the judgment of the circuit court should read as originally entered on June 28, 1926.

The judgment *nisi* is reversed and the cause is remanded to the circuit court, with directions to enter a new judgment herein in accordance with the views expressed in this opinion. It is so ordered. *Lindsay* and *Ellison, CC.*, concur.

PER CURIAM:—The foregoing opinion of SEDDON, C., is adopted as the opinion of the court. All of the judges concur.