First National Bank of Wynne *v.* Coffin.

Opinion delivered October 12, 1931.

*Ogan & Shaver,* for appellant.

*A. F. Clements* and *S. H. Mann,* for appellee.

BUTLER, J. This was a suit by the plaintiff in which he prayed for a cancellation of a contract entered into by and between plaintiff and defendant, that the defendant be required to accept reconveyance of property conveyed under said contract, for judgment against the defendant for all sums paid out by plaintiff on account of his purchase of said lands, and that certain outstanding notes for the remainder of the purchase price and the deed of trust securing same be canceled. The ground alleged for cancellation of the contract and deed

thereunder was mutual mistake of the parties as to the quantity of land conveyed. Defendant filed answer and cross-complaint asking for a foreclosure of its mortgage. From a decree in favor of plaintiff the defendant prosecutes this appeal.

From the evidence it appears that it was the understanding of the plaintiff that the defendant was the owner and in possession of a certain tract of land commonly known as the Austell place in or adjacent to the town of Wynne, Arkansas. Learning that the place was for sale, plaintiff interviewed Mr. Horner, the cashier of the defendant bank, regarding its purchase. The result of this interview was the execution of a contract by which it was agreed that certain described real estate be conveyed to plaintiff upon certain terms, and on December 12, 1927, a deed was executed conveying the land according to the description in the contract, being lots Nos. 301-450, both inclusive, of the Bedford Addition to the town of Wynne, Cross County, Arkansas, and the southwest quarter of the northwest quarter (SW¼ NW¼) of section 22, township 7 north, range 3 east, containing forty acres, more or less, in said county. The agreed purchase price was $4,750 of which the sum of $1,750 was paid in cash and the balance evidenced by certain promissory notes secured by deed of trust by which plaintiff conveyed to a trustee for the defendant bank the property described in the deed and also an additional forty acres. One of the notes for $500 was paid and interest payments on the others made in the sum of $431.61. Plaintiff paid the taxes for the years 1927, '28 and '29, in the sum of $178.27; for repairing buildings on the premises he expended $275; for surveying the tract and for attorney's fees the sum of $61.50, making a total expenditure of $2,959.66.

The Austell property was marked by well defined boundaries and inclosed by a fence, all said property being included in one field and cultivated as farm lands. Austell, the former owner, had so occupied and used the land for a period of twenty years when the defendant

bank acquired it under foreclosure proceedings. Plaintiff was familiar with the property, having known it for a number of years. He did not obtain immediate possession after his purchase because one Williams, a tenant of the defendant bank, was in possession of the dwelling house on the property, and it was not until about January 1, 1928, that the tenant of defendant moved out and plaintiff, by a tenant, moved in. A short time after plaintiff had entered into possession of the property, one J. C. Bell laid claim to some of the property near the northern boundary and attempted to take possession of same. Another person by the name of Burke also made claim to a portion of the property. Plaintiff attempted to, and did, compromise with Burke and Bell, buying them off for a small sum of money. This was called to the attention of the defendant bank and plaintiff and Mr. Killough, the attorney for the bank, with plaintiff's attorney, went out and looked over the land and discussed the situation. After this the town council of Wynne addressed a letter to plaintiff notifying him that the council had ordered the removal of all the obstructions and encroachments from certain named streets which appeared to be located in Bedford's Addition and in the field known as the Austell place of which plaintiff was in possession under his purchase from the bank. This, too, was called to the attention of the defendant bank, which undertook to remedy the situation by procuring an act of the Legislature for the reduction of additions and parts of same in cities and incorporated towns into acreage. The act as passed provided for proceedings in the county court on any question for the reduction of additions into acreage under the provisions of the act.

The plaintiff was notified of the passage of the act, and defendant undertook by proceedings in the county court, to obtain the benefits of such act. It appears from the order of the county court, however, that not all of the lots within the inclosure of the Austell place were included in the reduction to acreage, but only those

named in the deed from the defendant bank to plaintiff, and lots Nos. 301-450, both inclusive, were not included in the order.

Plaintiff (appellee) had a survey made of the property, and from this it was discovered that the lots described in the deed covered only a part of the property, and that about seven acres was not within the description, this part being included in lots 300-350, both inclusive. Further negotiations were had between the parties regarding an adjustment of the matter, but no one appeared to know just how to proceed, and finally in the spring of 1930, the board of directors of the defendant bank, acting through its president, notified the plaintiff that it would do nothing further toward perfecting the title. The plaintiff thereupon brought this suit.

■ The defendant bank contended, first, that there was no mutual mistake regarding the amount of land conveyed or its description; second, that it had not made any representations to plaintiff or shown him the land to be conveyed; and third, that plaintiff acted solely on his own opinion and judgment, and, if there was a mistake at all, it was not mutual, but the mistake of plaintiff only. The finding of the chancellor was against the defendant, and we are of the opinion that a consideration of all the circumstances and proof justified the conclusion reached. From a fair analysis of the testimony there can be no question that the defendant bank thought it owned and had title to the Austell place, and that it was attempting to convey all the land within the inclosure, and that plaintiff also thought that he was buying the land within the inclosure. While Horner, the cashier of the defendant bank, had only resided in Wynne for about two years, it is not shown that he and the officers of the bank were unacquainted with the boundaries of the Austell place, and it makes but little difference whether Horner actually pointed out the boundaries or not. For situated on land not included in lots Nos. 301-450, both inclusive, the land actually conveyed, was the dwelling

house and other improvements, which land was shown to be much more valuable than the southern part of the tract. This dwelling was considered to be on and a part of the property conveyed, for the tenant who farmed the property occupied such house as a tenant of the bank for the year 1927 and possession could not be, and was not, given under the deed from defendant to plaintiff until the expiration of the tenancy of Williams. When Williams moved out, the plaintiff, by his tenant, moved in about January 1, 1928.

The facts as found by the chancellor bring this case within the rule announced by the authorities cited in appellant's brief. *McGuigan* v. *Gaines,* 71 Ark. 614, 77 S. W. 52; *Augusta Cooperage Co.* v. *Bloch,* 153 Ark. 133, 239 S. W. 760. Although the description used in the deed was admittedly the same as that in the contract, and the appellant did convey all the land in the written contract, as we have seen, the evidence justified the conclusion that the description as used was mistakenly thought to cover the land actually intended to be conveyed, and, since it did not, under the authorities cited, the deed might be canceled for mutual mistake between the parties to the transaction unless the appellant is correct in his third and fourth contentions, *i. e.,* that any right plaintiff had to cancel the deed for mutual mistake was waived by his agreement, and that he is estopped by his conduct and delay in demanding a cancellation of the conveyance. This presents the greatest difficulty in the case and one on which the testimony is somewhat conflicting.

■ The appellant says that it has done everything within reason and within its power to satisfy appellee, and that an agreement was made between the parties under which the appellant agreed to procure the passage of an act through the Legislature by which the platted portion actually conveyed to plaintiff might be turned back into acreage; that, in consideration of this promise, appellee agreed that he would be perfectly satisfied with his purchase and continue his payments according to the

original agreement. In this connection Mr. Horner, the cashier of appellant, stated that an agreement was made between him as the representative of the bank and the appellee; that appellee feared the city would compel him to open up the streets and lots Nos. 301-450, inclusive, and that, if he knew that the city would not do this, he would still carry out his contract; that an agreement was made to procure an act authorizing the abandonment of the addition converting the lots to acreage; that the passage of this act was procured and an order of the court made under the authority of said act putting the lots back into acreage, and that when this was done appellee paid a $500 note which was past due and which he had before refused to pay on account of the condition of the title. This payment was made about the first of July, 1929, which only paid the principal and did not take care of the past-due interest; that appellee's attention was called to this by letter of July 12, 1929, and that at a later date he and the appellant adjusted the interest by waiver of the bank and in addition paying one-half of the purchase price that appellee had paid to Burke, one of the parties claiming an interest in the property. The amount paid by the bank on the Burke matter was $5.72. Horner was asked: "After having waived the interest and having agreed with Mr. Coffin to pay Mr. Burke one-half of the purchase price of the lot in question, did Mr. Coffin state whether or not if you would do that he would be perfectly satisfied and continue with and make the balance of the payments due for the land?" The answer was, "He did." Continuing, Mr. Horner testified that thereafter the appellee made no objection until March 21, 1930, when witness was notified by letter from appellee's attorney that he was demanding that the bank refund him all the money appellee had paid on purchase price of the land.

The appellee testified that he had purchased the property for a particular purpose; that in about three weeks after taking possession, when he discovered that others were claiming some part of the property, he was

much disturbed and immediately notified the bank, which seems to have done nothing but look the situation over and advise appellee that his title was good because of the length of time the property had been adversely held by the bank and its predecessors in title. According to appellee's testimony, which is undisputed, the appellant bank afforded him no assistance in dealing with those who were claiming title, although appellee was trying to clear same. On cross-examination of the appellee, the intimation is made that the appellant bank, when first notified that the description in the deed did not cover all of the property sought to be conveyed, offered to cancel the trade and to reimburse the appellee the money he had paid on the purchase price, and that appellee refused to reconvey the land. But he answered those questions containing the above intimation in the negative, stating that he had bought the land for a definite purpose, and had no intention of ever going back on the deal as long as he thought the bank would give him a title to it, but that he had no recollection of the offer made or of his refusal. There was no testimony introduced to contradict this. Appellee further testified that some time later on the town council gave appellee notice to open the streets through the land and to remove the fences, and to meet this defendant procured the passage of an act by which additions that had been platted into lots and blocks might be reduced to acreage. For some reason, however, probably still believing that the lots as described in the deed occupied the entire area of the land conveyed, the order was procured for only the reduction to acreage of the lots in the deed, whereas it developed that these lots were not the ones on which the dwelling house was located and which were being claimed adversely by other parties. Before the procuring of that order, the appellee had failed and refused to pay a $500 note due, and after the order of the county court he paid the same. He stated that he did this in order to comply with his part of the contract according to the understanding he had had with Horner, the cashier

of the bank; that when Mr. Killough, his attorney, was satisfied as to the title he would abide by the latter's decision, but that Mr. Killough had never been satisfied. The question was asked appellee: "Is it not true that both Mr. Killough and myself (the interrogator) advised you that the only method by which the title to this seven acres not conveyed by the bank could be straightened out would be by a suit brought by us to quiet the title," and he answered, "No, sir; I didn't think it was my place to claim that land because I bought it from the bank, and it was up to them. I don't see why I should be out any more expense—I have bought it once."

Appellee further testified that after the order of the county court, in the spring of 1930, he had two meetings with the bank officials endeavoring to get the matter straightened out, and they were trying to adjust it; that he had no intention of handing the land back to the bank because he wanted it and believed they were sincere in trying to fix it, and the first knowledge he had that the bank had no intention of quieting the title was when he attended a meeting of the board of directors in the spring of 1930, and the president of the bank so stated. Appellee also testified that he had a conversation with Mr. Horner who told him that he had sold him everything under fence and would take the matter up with his attorney and see what could be done about it; that, from the information appellee gathered from his dealings with Horner and because the bank was a reputable institution, he believed it would do the right thing, and it was only when the president of the bank, acting for the bank, refused to take further steps to adjust the title that he concluded that the bank would not do this, and in a short time thereafter he brought this suit.

Horner, the cashier, and the appellee, were the only persons testifying as to these transactions, and, while the evidence as disclosed by the record is not clear as to what the intention of the parties was with reference to claiming the title and what they were attempting to do and what was the attitude of the appellee, we can-

not say that the conclusion reached by the chancellor that the appellee had not waived any right he might have to call for a cancellation of the contract was against the preponderance of the testimony.

The fourth ground urged by the appellant for a reversal of the case is that the appellee is estopped by his conduct and delay in demanding a cancellation. The cases cited by appellant to support this contention, *Fitzhugh* v. *Davis,* 46 Ark. 348, and *McCormick* v. *Daggett,* 162 Ark. 16, 257 S. W. 358, correctly state the rule that one who desires to rescind upon the ground of mistake or fraud must, upon the discovery of the facts, at once announce his purpose and adhere to it; if he be silent and continue to treat the property as his own, he will be held to have waived the objection and will be conclusively bound by the contract as if the mistake or fraud had not occurred, and must proceed with reasonable diligence to disaffirm the contract so that both parties may as nearly as. possible be restored to their original positions. In the case at bar, however, we do not think that the facts, as found by the chancellor, bring the appellee within the rule for he immediately brought to the attention of the officers of the appellant bank the fact that others were adversely claiming the property and continued to urge them to perfect the title until shortly before the institution of the suit, and the delay was occasioned by his mistaken belief that the bank would do whatever was necessary to perfect the title.

This view disposes of the fifth and last contention of the appellant that it cannot now be placed in the same position it was when a discrepancy in the acreage was first discovered, for if that be true, this was occasioned through no fault of the appellee.

The decision of the trial court, not being against the preponderance of the evidence both as to the complaint and cross-complaint, will be affirmed.