## READE v. BROOKS et al.

### BROOKS et al. v. READE.

#### Nos. 13753, 13754.

United States Court of Appeals Eighth Circuit.

May 13, 1949.

Joseph R. Brown, of Kansas City, Mo. (Wm. E. Davis, of Kansas City, Mo., on the brief), for William Brooks and Fannie E. Brooks.

Thurman L. McCormick, of Kansas City, Mo. (Leo T. Schwartz, and N. R. Fischer, both of Kansas City, Mo., on the brief), for Charles H. Reade.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

WOODROUGH, Circuit Judge.

The judgment from which these appeals were taken adjudicated controversies arising out of a coal mining lease of coal lands in Pope County, Arkansas, which was entered into on June 1, 1943, between William Brooks and Fannie E. Brooks, his wife, of Russellville, Arkansas, as lessors, and Charles H. Reade of Jersey City, New Jersey, as lessee. The term of the lease was fifteen years and it called for $1 per ton royalty on coal extracted and a minimum royalty of $400 per month payable on the tenth of every month beginning on August 1, 1943. It contained the usual and some special provisions covering the mining and development operations the lessee agreed to perform. The lessors brought this action against the lessee in October, 1945,[1] and on the first cause of action prayed recovery in the sum of $82,000 damages for the lessee's failure to fulfill his lease contract. They alleged that the lessee entered upon and mined coal from the property until June 1, 1944, but abandoned said mining of coal on that date, and though requested to comply with his contract advised the lessors that he had abandoned the lease and did not intend to comply with its terms. That he failed and refused to pay the minimum royalty or other royalty called for by the lease and as a result of his failure to perform as required by the lease lesssors' property had been damaged in the sum of $10,000. They alleged full compliance on their part with the terms of the lease and that they stood ready, willing and able to comply therewith in the future and that they had since lessee's abandonment of his lease exerted every reasonable effort to lease the lands for the benefit of the lessee. In a second cause of action they sought to recover the price and fair value of supplies sold by them to the lessee for his use at the mine in the sum of $2,818.57.

The lessee denied liability on the first cause of action on the ground that the

---

[1] The exact date is not shown.

execution of the lease was induced by fraud, misrepresentation and deceit practiced upon him by the lessor William Brooks, and that the lessors had elected to and had forfeited the lease for lessee's non compliance with its terms and the lessee had acquiesced and the lease became terminated on October 16, 1944. As to the second cause of action, the lessee alleged that the parties were obligated by the lease to submit the claim therein stated to arbitration which the lessee requested and the lessors refused. The lessee also filed a counterclaim against the lessors for $16,000 damages resulting from the alleged fraud and deceit practiced upon him by the lessors.

The case was tried to the court without a jury and judgment was entered in accordance with the court's findings of fact and conclusions of law.

The judgment awarded the lessors recovery on their first cause of action for unpaid minimum royalties of $400 per month for the period from August 1, 1943 up to October 16, 1944, in the amount of $5,400 and denied them recovery on their second cause of action. It denied the lessee any recovery upon his counterclaim. The lessors appeal from that part of the judgment which restricts their recovery to the monthly minimum royalties of $400 per month from August 1, 1943 to October 16, 1944, and which denies them the further and additional recovery they prayed for on their first and their second causes of action, and the lessee appeals from that part of the judgment which awards recovery to the lessors and also to that part which denies him recovery on his counterclaim.

## Opinion.

The findings and conclusions upon which the court based the judgment awarding but restricting the lessors recovery on their first cause of action, were:

## "Count 1.

"The Court finds the facts to be:

"That on the 1st day of June, 1943, plaintiffs and defendant entered into a coal mining lease whereby plaintiffs leased to defendant coal lands owned by them in Pope County, Arkansas. The final execution of said lease was had in the State of Arkansas. On June 7, 1943, defendant entered into possession of the lands in question and proceeded with development work in the mine slope located thereon.

"On June 1, 1944, defendant, in a letter addressed to plaintiffs, repudiated said mining lease and thereafter failed and refused to carry out or perform the obligation assumed by him therein.

"Subsequent to the repudiation of said lease, plaintiffs employed Carpenter, Gilmour and Dwyer, Attorneys-at-Law, Jersey City, New Jersey, to represent plaintiffs in all matters concerning their rights under said lease agreement.

"Under date of September 12, 1944, said attorneys, Carpenter, Gilmour and Dwyer, representing plaintiffs, served notice upon defendant, declaring a forfeiture of said lease and informing defendant that the lessors therein elected to take back the property leased and the machinery and equipment thereon as of October 16, 1944. Plaintiffs had knowledge of the action of said attorneys in causing said notice of forfeiture to be served on defendant, and had knowledge that the service of said notice of forfeiture and their re-taking possession of the property in question would estop them from claiming as damages in this action future royalties reserved in said lease after the forfeiture thereof. At no time after service of said notice of forfeiture did plaintiffs notify defendant that said attorneys were not authorized by them, to serve such notice of forfeiture, and, prior to the time of the holding of a pre-trial conference in this case, plaintiffs had not notified defendant that they repudiated the authority of said attorneys to effect a forfeiture of said lease.

"After the defendant went into possession of the premises in question, he continued with mining operations thereon until March 2, 1944. Subsequent to the last-mentioned date, a receiver was appointed by the Chancery Court of Pope County, Arkansas, for said mining lease, at the instance of certain creditors of defendant. Said receiver retained possession of the property until on or about September 2, 1944, at which time all of said property, real and

personal, involved in this action was released to, and plaintiffs took possession thereof. At or after taking possession of said property, plaintiffs did not give notice to defendant that they were holding possession of the same for the benefit of defendant. Plaintiffs have retained possession of said property ever since September 2, 1944.

"Defendant under the terms of the lease in question was obligated to pay to plaintiffs a minimum royalty of $400.00 per month, during the term thereof. From August 1, 1943, to the time of the forfeiture of said lease by plaintiffs, defendant paid to plaintiffs the [total] sum of $400.00 as royalty. During the time defendant was in possession of the leased property, and until the forfeiture thereof by plaintiffs, defendant mined less than 1,000 tons of coal from said property. During said period there accrued under the terms of said lease minimum royalty in the amount of $5,800.00."

The Court declared the law to be:

"That the notice of forfeiture of the lease in question, and re-taking possession of said mining property, effectively terminated the mining lease between plaintiffs and defendant and relieved defendant of the obligation to pay royalties thereunder, after October 16, 1944.

"Plaintiffs' employment of attorneys to represent and protect plaintiffs' rights under the lease in question was prima facie authority to said attorneys to serve on defendant the notice of forfeiture in question.

"The knowledge of plaintiffs that said notice of forfeiture had been served upon defendant, and plaintiffs' failure to repudiate the authority of said attorneys to so act, at any time prior to the institution of this action, estops plaintiffs from now contending that the lease in question remains in full force and effect as a presently binding obligation on defendant for the term thereof.

"Plaintiffs are entitled to recover from defendant the sum of $5,400.00, minimum royalty accrued under the terms of the lease in question from August 1, 1943, to October 16, 1944.".

On their appeal the lessors contend that the court erred in its determination that the lease in question was terminated by them October 16, 1944. They insist in this court, as they did below, that they were entitled to recovery against the lessee on the theory of a total breach by him of the fifteen year lease and could include in their damages in addition to what the court allowed them not only the present value of the minimum royalties during the remaining lease period, but also amounts to compensate for the loss of advantages anticipated from performance of the lease. In the argument to support the contention citations are made of the cases in which a lessee of property under a long term lease had been held liable to the lessor on account of "total" or "anticipatory" breach of the lease not only for the lessee's obligations in default at the time of the suit, but also on account of those which are to accrue under the terms of the lease in the future.

But it is clear that in order for the lessor to hold the lessee for rents or other obligations to accrue in the future the lessor must strictly and rigidly preserve the integrity of the lease on his part. If he exercises the power reserved to him in the lease to forfeit it and takes his property back, he can recover nothing further from the lessee than the rental then due and damages for injury to the property then done or anticipated. We are aware of no case sanctioning any greater recovery in the cases where the lessor has taken his property back after a forfeiture for defaults of the lessee.

In Hawkinson v. Johnston, 8 Cir., 122 F.2d 724, 137 A.L.R. 420, this court sustained recovery of damages by the lessor against the lessee for anticipatory breach of a long term lease of land, the damages consisting of the difference between the rental value for a predictable ten year period and the stipulated rental for that period, and fully discussed the applicable principles, but the decision was predicated upon the showing that the lessor had rigidly adhered to the lease on his part and avoided any act inconsistent with maintaining it in force. The case illustrates what we hold to be settled law in Arkansas that upon dec-

laration of forfeiture and taking the property back by the lessor, the damages recoverable against the lessee must be restricted as declared by the trial court. Grayson v. Mixon, 176 Ark. 1123, 5 S.W. 2d 312; Hayes v. Goldman, 71 Ark. 251, 72 S.W. 563; 2 McAdam Land Tenant, 3d Ed., 1283; and Cf. Von Schleinitz v. North Hotel Co., 323 Mo. 1110, 23 S.W.2d 64, 75-77; Bradbury v. Higginson, 162 Cal. 602, 123 P. 797.

The finding of the trial court from which it concluded that the lessors herein effectively terminated the lease in question are in accord with the evidence. Lessors urge that the court erred in finding that the forfeiture notice by their counsel to the lessee was effective for the reasons that the lessee had previously repudiated the lease by letter to the lessors and nothing remained to be forfeited therefore; that the forfeiture notice did not conform to the terms of Section 12 of the lease;[2] and that lessors' counsel at that time was without authority to give the notice of forfeiture to the lessee. On September 12, 1944, counsel for lessors notified the lessee by letter: " * * * Please take notice that because of your failure to perform the specific terms of this lease, the said lessors have elected to take back the property leased and the machinery and equipment thereon on October 16, 1944, and that they will hold you responsible for the damages proximately resulting from your breach of the terms of said lease. This action is taken as a result of your failure to operate the mine and premises leased in a diligent and workmanlike manner, and your failure to pay the royalties required by the terms of said lease. If you desire to fulfill the provisions of said lease, please notify us forthwith." It is evident that the lessee's refusal to perform the terms of the lease is the very ground upon which Section 12 gives a right to the lessors to declare a forfeiture if they so elect. Nor does this section contemplate that a second notice must be given by the lessors to effect a forfeiture. It provides that "this lease is subject to forfeiture, upon 30 days written notice served on lessee by lessors, stating the point or points of failure to perform." It then provides that "in the event of failure to thus perform [during said 30 days] lessors may, with or without process of law, declare this lease forfeited and void, and take possession of the property, owned by the lessor." There is clearly no need or requirement for a second notice after the passage of at least 30 days in order for forfeiture to be executed and perfected. Only one written notice was required and that conclusively informs the lessee that unless within 30 days he in good faith performs the terms of his lease, the lease is forfeited and void. It further appears from the record that on September 8, 1944, lessors' counsel informed them that they would give notice of forfeiture to the lessee which they did by letter of September 12, 1944, supra. Subsequently, on November 4, 1944, lessors wrote their counsel disclosing full knowledge of the notice having been sent and asserting no denial of the authority of their counsel to draw and send the notice to the lessee, nor did lessors in any manner attempt to inform lessee that their counsel lacked authority to declare a forfeiture for them. On the contrary, they took back all their property which had been leased, real and personal.

The court's findings as to the lessors' knowledge of the action of their attorneys in giving notice of forfeiture and of the effect of the notice and as to their re-taking possession of the property are fully supported and we agree with the conclusion of the court that after the lessors had forfeited the lease because of the lessee's "failure to operate the mine in a diligent and workmanlike manner" and his "failure to pay the royalties required by the terms of the lease" the lessors could

---

[2] "In event of the failure of lessee to perform the specific terms of this contract, this lease, at the election of the lessors, is thereby subject to forfeiture, upon 30 days written notice served on lessee by lessors, stating the point or points of failure to perform. During said thirty days however, said lessee may, in good faith and earnestness, perform said term or terms, thus preventing forfeiture, but in the event of failure to thus perform, lessors may, with or without process of law, declare this lease forfeited and void, and take possession of the property, owned by the lessor."

630

not maintain an action on the theory of "total" or "anticipatory" breach committed by the lessee. If the lessors at any time had the right to sue lessee on the theory of total breach of the lease they lost it by their forfeiture and taking their property back without notice to the lessee that they recognized any remaining right or interest in him.

As to the claim of the lessors for damages to their mine property the court found: "During the time defendant was in possession of said mining property, he expended approximately the sum of $16,000.00 in the improvement and development thereof. At the time of the forfeiture of the lease in question and the re-taking of possession of said property by plaintiffs, the mining shaft or slope on said property was, by reason of improvements and developments made thereto by defendant, in better condition for mining purposes than at the time defendant leased said property from plaintiffs. Since cessation of mining operations on said mining property by defendant, the shaft or slope thereon has filled with water", and it concluded: "The burden of proof is upon plaintiffs to prove by a preponderance of the credible evidence in this case, the nature, character and extent of all present or future damage suffered or sustained by them because of the breach of the lease in question by defendant. Plaintiffs have not sustained the burden of proof so cast on them, or proven any damage to the real or personal property leased to defendant except accumulated minimum royalties aforesaid."

It was contended for the lessors that a large part of the money expended by the lessee while he was in possession was applied wastefully to quick extracting of coal rather than to improvement and development, but we think the finding of the court is not clearly erroneous and we discern no error in the conclusion of law stated. The lessors having taken their property back found it in better condition by reason of the expenditures made on it by the lessee and have suffered no damage beyond their unpaid royalties.

The court did not err therefore in refusing to find damage to the property and in its restriction of the amount of the lessee's recovery to the unpaid royalties.

### The Lessee's Counter Claim.

In addition to the findings quoted the court made the following responsive to the issues on the lessee's counter claim: "At the time of negotiating the lease in question, plaintiffs made and caused to be made to defendant the following material representations concerning the nature and character of said mining property, to-wit: that the land in question was proven coal land, underlaid with a 36-inch vein of coal; that plaintiffs had operated the mine in question and that the machinery thereon was in good condition and adequate to produce 200 tons of coal per day; that said mine was in good condition and there was available in the slope thereof, for immediate removal, when the mine was de-watered, a substantial quantity of coal; that there was a wall of coal, 175 feet in length, that had been developed under previous operations, from which coal could be removed immediately upon de-watering of said mine; that the mine in question could be de-watered within a period of five days with machinery then available on the property; that no faults were contained in the vein of coal on said property; that said property contained coal in certain quantities, as shown in Exhibits 6, 7, 9 and 10 [elaborate and detailed reports and factual data evidently prepared and intended for use as prospectus]; that the quality of the coal in said mine was of a character as to command a bonus or premium above the market price of other coals in the Shinn Basin. Defendant inexperienced in the coal mining business, relying upon such representations, was thereby induced to and did enter into the lease in question. The material representations so made and caused to be made by plaintiffs were false and untrue and known so to be by plaintiffs, in this, to-wit: the vein of coal on said land contained a 9-inch vein of 'jack', a non-commercial coal substance; the machinery on said property was not in good condition and capable of mining 200 tons of coal a day; the slope of said mine was not in good condition for mining but required considerable timbering to make it

safe, and no coal was therein, ready for immediate removal upon de-watering; no face of coal was immediately available in said slope for mining, upon de-watering, but had to be developed; that said mine could not be de-watered within five days with machinery and equipment available on said property; that faults were contained in vein of coal on said property. Upon de-watering of the shaft or slope of said mining property, it was readily apparent to defendant, and his agents in charge of, and who thereafter inspected said mining property for defendant, or should have been apparent to them, that all the material representations made by plaintiffs concerning said property which induced defendant to enter into said lease agreement were false and untrue. Notwithstanding such knowledge on the part of defendant, defendant continued with the development of said property and the mining of coal therefrom and expended many thousands of dollars thereon, after knowledge of the falsity of such facts. Defendant did not repudiate the lease in question because of false representations made to him by plaintiffs, until on June 1, 1944, approximately eight months after knowledge of such false representations were made known to defendant."

It also concluded:

"The Court declares the law to be, that the failure of defendant to repudiate the lease in question, within a reasonable time after ascertainment of facts that revealed representations made by plaintiffs to defendant, which induced defendant to enter into the lease in question, were false and untrue, estops defendant from thereafter repudiating said lease because of such fraud, or successfully maintaining any action against plaintiffs for damages on account of any fraudulent representations made by plaintiffs to defendant, which induced the execution of said lease.

"Defendant permitting eight months to elapse after discovery of fraudulent representations made by plaintiffs to defendant which induced him to enter into said lease, and the expenditure of several thousands of dollars in the development and improvement of the mining property in question after discovery of such fraud, is an un-

reasonable length of time and conduct on the part of defendant, so as to estop defendant from repudiating said lease because of fraud, inducing the execution thereof, and debars defendant from recovery under his counter-claim here asserted against plaintiffs."

After the court handed down its findings and conclusions the lessee moved for amended findings to the effect that the falsity of the representations was discovered in piece-meal and progressive manner and that the lessee had acted promptly when it was made to appear definitely that coal could not be produced in paying quantities because of faults found in the vein, and upon refusal thereof made a motion for new trial "on one issue, viz: was the repudiation of said lease on the ground of fraud and misrepresentation declared by the [lessee] within a reasonable time, under all the circumstances in evidence", which was also denied. In denying the motions the court stated, i. a.: "We believe that the defendant continuing with the operation of the mine property after he learned and knew of the false representation made to him by plaintiff, was a gamble on defendant's part, and not such a good faith operation as the law requires which would relieve him of the consequence of such action. By continuing with the operation of the mine, defendant waived the fraud complained of, and was bound by the terms of the lease until the same was cancelled by plaintiffs."

It is earnestly contended for the lessors that each finding of misrepresentation was clearly erroneous and that they made no material misrepresentations to induce the lease and it has been necessary to make careful study of the extended testimony, from which we conclude that none of the findings is clearly erroneous.

We are not unmindful that the mine was full of water when the deal was made, nor that Mr. Brooks had lived a long life near the property and Mr. Reade was a stranger there and had no experience with coal mines or mining, and on first reading of the list of misrepresentations the court's conclusion that Mr. Reade can take no advantage of them in this lawsuit might seem harsh. But we are not per-

suaded that the court mistook or misapplied the applicable law.

It appears that the mining enterprise was brought to Mr. Reade's notice by a Mr. Blackett, who was enthusiastic about it, and that on entering into the lease Reade agreed to pay Blackett $35 a week for managing the mine and to give him 25% partnership interest on certain conditions. Blackett carried on all the mining operations on the ground and Reade in New Jersey furnished the money. Blackett wrote long letters and reports to Reade both before and after the lease was entered into and the contentions made for Brooks that Reade relied on Blackett's representations rather than on those of Brooks have some support in the evidence. But the testimony leaves no doubt that when Blackett and his men after one or two months of hard work got the mine all de-watered and cleaned out, they were in position to observe every substantial and material element of falsity in the representations which were traceable to Brooks. By that time Blackett had become familiar with the machinery and the condition of the mine and the size and character of the coal vein and amount of water to be contended with, and his testimony that he had talked to miners who had worked in the coal field and learned of faults which had been encountered is entirely credible. The inference drawn by the trial court from all the evidence that the lessee "continuing with the mine operations after he learned and knew of the false representations made to him by plaintiff, was a gamble on defendant's part" reflects a fair and careful appraisal of the evidence and is fully supported.

■ It is contended for the lessee that it was the discovery of the existence of faults in the strata of coal which caused him to repudiate the lease and that he acted promptly upon that discovery. But the evidence does not support the contention. He encountered no faults in his operations. They had been shown in former operations and the probability of their occurrence in the course of continued operations was known to his agents on the scene by the time the mine was cleaned out. The court

was not in error in its declaration of the law as to the duty of the lessee to act promptly upon discovery of the falsity of representations made to him and that when after such discovery he failed to repudiate his lease and continued to hold the property leased to him and to expend his money in the hope of making a profit out of it, he was estopped to repudiate the obligations he had undertaken as the condition of his use and occupancy of the property. That such is the law in Arkansas, as elsewhere, appears settled. The court's denial of relief upon the lessee's counterclaim was not erroneous. First National Bank of Wynne v. Coffin, 184 Ark. 396, 42 S.W.2d 402; Newsum Auto Tire Vulcanizing Co. v. Shoemaker, 173 Ark. 872, 294 S.W. 11; Foster v. Dierks Lumber & Coal Co., 175 Ark. 73, 298 S.W. 495; New York Life Ins. Co. v. Adams, 151 Ark. 123, 235 S.W. 412.

■ On the lessors' claim for the price and fair value of mining supplies sold by them to the lessee asserted in plaintiffs' second cause of action, the court found:

"The Court finds that under the terms of the lease in question defendant had the right to make use of all mechanical or structural equipment which was on the property at the time of the signing of said lease.

"It was the understanding of the parties under the above stipulation that the machinery owned by lessors and on the property at the time of the execution of the lease, was in working condition and ready to be used by defendant in the development and mining of coal from said property. At the time of the execution of said lease, certain parts of the mechanical equipment then on the leased premises necessary to the operation thereof were located at plaintiffs' place of business and house in Russellville, Arkansas. In the negotiations for said lease, plaintiffs pointed out said fact to defendant. On June 3, 1943, before defendant took actual physical possession of said mining property, plaintiffs delivered on the site certain supples for which plaintiffs charge defendant and seek recovery in the statement of account

introduced in evidence. (Exhibit E). On June 7, 1943, the day defendant took actual possession of said mining property, plaintiffs delivered other supplies to the site which, from the nature thereof, appear to have been necessary to start the mechanical equipment used in the development of said leased property. Plaintiffs likewise charge defendant for such items in said statement of account.

"During the period defendant was engaged in operating the mining property in question, plaintiffs delivered to Blackett, defendant's mine foreman, certain other supplies necessary to the operation of the mechanical equipment owned by plaintiffs and used in said mining operation and development. Two-thirds of the stock so supplied by plaintiffs and listed in Exhibit E, had formerly been used at the mine in question, and had been accumulated by plaintiffs from other mining operations.

"At the time plaintiffs delivered said supplies, no price was agreed upon between plaintiffs and Blackett, or any other person to whom such supplies may have been delivered. The charges made by plaintiffs for the supplies enumerated in Exhibit E, were revised by plaintiffs from time to time and the final amount of the charges claimed by plaintiffs in said account were not established until June 1, 1945. As shown by Exhibit E, many of the items charged therein were mere estimated values made by plaintiffs. All the items contained in the account set forth in Exhibit E, were on September 15, 1944, in the keeping of plaintiffs."

And the conclusion of law was:

"The Court declares the law to be:

"That the burden of proof is upon the plaintiffs to prove by a preponderance of the credible evidence, that at the special instance and request of defendant, plaintiffs sold and delivered to defendant the items of merchandise set forth in Exhibit D and E, and that the prices charged therefor were the reasonable market value thereof. Plaintiffs have failed to sustain the burden of proof so cast upon them under the second count of his petition."

Careful consideration of the evidence and the conclusion concerning this second cause of action has not persuaded that the judgment denying relief thereon was erroneous. The lessors were not in any position to maintain an action upon an account stated in respect to the many small items of pipe and tools and supplies they delivered on the property before and during the mining operations and the court properly declared the burden of proof upon them to justify recovery by them. The court pointed out, and the evidence shows, that on re-taking the mine after declaring forfeiture of the lease, the lessors took back all of the items involved in the second cause of action and treated them as their own without recognizing towards the lessee any right or interest in them and it is a fair inference that he acquiesced.

The record shows that the case was tried with painstaking care and fairness by the trial court, and that the judgment is without error. It is therefore in all respects affirmed.

Affirmed.