M. E. RATLIFF *v.* BANK OF NEW
ORLEANS AND TRUST COMPANY and John
Hampden LEWIS, Trustee

79-67                                        586 S.W. 2d 237

Opinion delivered September 17, 1979
(Division II)

*David Solomon,* for appellant.

*Jake Brick,* for appellees.

CONLEY BYRD, Justice. Appellant sought to set aside a mortgage he had executed on Waverly Plantation to the appellee Bank of New Orleans and Trust Company for $1,-200,000.00 on the basis of mutual mistake and fraud. The trial court in holding against appellant's contentions stated:

> "At the time of the sale, Allen Thompson knew that there were not 2,300 and some acres in Waverly. I almost feel that M. E. Ratliff knew that there were not 2,300 and some acres in Waverly. There is question about Insley Bar being in Tennessee or Arkansas, but

the plat shows that part of it certainly is in Tennessee. The Defendant stated that he had the plat prior to the sale so he is charged with notice of this. And if the Vendee knows the amount of land he is purchasing, he has no right to rely upon the representation of the Vendor as to the quantity of the land. W. D. George, upon questioning by the court, stated that Mr. Lewis told Mr. Ratliff that there were not 2,400 acres but only 1,900 acres of which 1,500 acres were cultivatable. Due to Mr. Martin's testimony the Defendant Ratliff was put on notice that there were only 1,543 acres in the farm in January. On March 15, Mr. Ratliff executed a lease agreement for an additional year, entering into a two-year lease on the property which results in an inconsistent position. The law precludes one who accepts the benefits from repudiating the resulting obligation. Further, the Defendant, Ratliff, entered into agreements for the sale of Waverly on more than one occasion which would have resulted in some $50,000.00 profit. Courts have held that leasing of property by the purchaser who holds a right to rescind, constitutes a waiver of that right. Therefore, the lease to Looney Brothers granting them an Option with knowledge of the deficiency of the acreage amount to a waiver of the right of rescission."

Based upon an appraisal of C. V. Dodd showing that Waverly Plantation consisted of 2349 acres the Bank of New Orleans had taken a mortgage to secure an indebtedness of Allen Thompson in the amount of $1,050,000. Thompson had other indebtedness with the Bank of New Orleans including two outstandings letters of credit totalling $220,000. In October of 1976, Thompson, who was not meeting his obligation with the Bank of New Orleans on his Waverly Plantation note, contacted appellant Ratliff about the purchase of Waverly Plantation. Ratliff was given a copy of a "quad" map covering parts of Tennessee and Arkansas with a shaded area encompassed by a pink border with the words "Waverly Plantation approx. 2300 M/L" printed thereon in large letters.

Ratliff testified that Thompson told him there were 1500 acres in cultivation and another 400 acres that could be put in

cultivation making a total of 1900 acres of cultivated land. Thompson at the same time agreed to make the financing arrangements with the Bank of New Orleans subject to a $600,000 mortgage in favor of Prudential Insurance Company. After Thompson and Ratliff reached an agreed price of $1,900,000, Thompson contacted John Hampden Lewis, Vice President of the Bank of New Orleans who came to Memphis to investigate the proposed sale to Ratliff.

The parties have a difference about what Lewis said while in Memphis. Ratliff says that Lewis represented Waverly Plantation to consist of 2400 acres, 1900 of which was cultivatable — *i.e.,* 1500 in cultivation and 400 that could be cleared. Bill George, who shares offices with Ratliff testified that Lewis stated he understood that farm to contain 2400 acres with 1500 acres in cultivation and another 400 that could be cleared. However, Bill George had originally understood from Thompson that there were 1000 acres of cotton and 900 acres of beans in cultivation. John Hampden Lewis testified that he did not discuss the number of acres involved.

John Hampden Lewis testified that he was furnished a financial statement by Ratliff showing net assets in excess of four million dollars. Ratliff denies that he furnished such a statement. However, the record contains such a financial statement admittedly containing Ratliff's signature.

The record shows that Ratliff and Thompson together with their lawyer Hal Freeland showed up at the Bank of New Orleans on November 12, 1976, to close the transaction. The Bank of New Orleans refused to make Ratliff a $1,200,000 loan subject to the Prudential Mortgage without a down payment of $125,000. Ratliff proposed to pledge some German 1925 series bonds as security but the Bank of New Orleans refused. In late November John Hampden Lewis flew to Memphis and contacted Mr. George Long, an independent real estate appraiser to determine the value of Waverly Plantation for purposes of a quick sale. Long apparently contacted Lewis by phone on December 3, 1976, and gave Lewis the following information as per Defendant's Exhibit "B" to wit:

12-3-76

$1,250,000.00

| | |
|---|---|
| 1,000 Acres | North of Levee, protected land 840 acres, very good land |
| 600 Acres | South and East of Levee, 168 acres of farmable land |
| 250 Acres | 61 acres on both sides of levee 302 of timberland |

| | | |
|---|---|---|
| 1,031,050 | 1,371 | Total Acres plus vast amount of acreage on Sandbars — and subject to arguments as to ownership (800 acres). |

On December 6, 1976, the matter was closed at the Bank of New Orleans with the delivery of a certified check in the amount of $111,632.49 and the Bank's acceptance of the $1,200,000 note and mortgage originally executed by Ratliff on November 12, 1976.

Following the closing on December 6, 1976, Ratliff contacted Joe E. Martin with the Federal Land Bank in January and was informed that there was only 1,543 acres in Waverly Plantation which included only 909 acres of cropland.

Joe Looney contacted Ratliff with reference to leasing the property before March 1977 and informed Ratliff that there was not 1500 acres in cultivation. Looney Brothers Farms, a partnership, had farmed Waverly Plantation from 1956 through 1978 except for three years.

Notwithstanding the foregoing information, Ratliff made two advanced quarterly interest payments in the amount of $24,266.70 each in March and June 1977. Ratliff also entered into a two year lease agreement with the Looney Brothers Farms containing an option to purchase and pledged the two year rent agreement to the Forrest City Production Credit Association for $100,000 loan.

Ratliff's cross-complaint against Thompson was dismissed without prejudice.

Like the trial court, after viewing the "quad" map (Defendant's Exhibit "R") we have some question about whether appellant Ratliff was justified in asserting that Waverly Plantation consisted of 2300 acres. He would certainly have been put on notice as early as his first discussion with the Federal Land Bank's agent that that much acreage did not exist. Instead of acting promptly, however, he made two quarterly advance payments of interest to the bank in March and June of 1977 and entered into the two year lease with Looney Brothers Farm containing an option to purchase and by which he secured $100,000 from the Forrest City Production Credit Association. Thus as we view the facts, Ratliff by accepting the benefits of the bargain is estopped to demand rescission against the Bank of New Orleans. As pointed out in *McCormick* v. *Daggett*, 162 Ark. 16, 257 S.W. 358 (1924):

> "It is clear that McCormick is not now entitled to rescind the contract. One who claims to have been deceived is required, as soon as he learns the truth, to disaffirm the contract with all reasonable diligence, so that both of the parties may, as nearly as possible, be restored to their original position. 'He is not,' says Pomeroy, 'allowed to go on and derive all possible benefits from the transaction and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part. If after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of and relief from the misrepresentations.' Pomeroy's Equity Jurisprudence (4th ed.) Vol. 2, § 897."

To avoid the foregoing law with respect to the necessity of prompt action by one claiming rescission, appellant relies upon *First National Bank of Wynne* v. *Coffin*, 184 Ark. 396, 42 S.W. 2d 402 (1931). That case is distinguishable from the facts before us because there the First National Bank of Wynne undertook to remedy the deficiency in its deed and

persuaded Coffin to give them time to get an act through the General Assembly of the State of Arkansas. In other words the First National Bank of Wynne by its conduct caused the delay. Here no such conduct can be laid at the feet of the Bank of New Orleans.

Affirmed.

We agree: HARRIS, C.J., and HOLT and PURTLE, JJ.